In re Suit to Quiet Title to That Portion of The Bed And Banks of The Coeur D'alene Lake and St. Joe River Lying Within The Exterior Boundaries of The 1873 Coeur D'alene Reservation.

**UNITED STATES of America, Plaintiff–Counterdefendant,**

**and**

**Coeur D'Alene Tribe, Plaintiff in Intervention Counterdefendant in Intervention,**

**v.**

**State of IDAHO, Defendant.**

No. CV94–328–N–EJL.

United States District Court, D. Idaho.

July 28, 1998.

Lois J. Schiffer, U.S. Dept. of Justice, Land & Natural Resources Division, Kevin K Washburn, U.S. Dept of Justice, Indian Resources Section, Envir. and Nat. Resources Div., Hank Meshorer, U.S. Dept. of Justice, Environ. & Nat. Resources Div., Washington, DC, for plaintiffs.

Steven W. Strack, DAG, Clive J. Strong, Matthew J. McKeown, Office of Attorney General, Natural Resources Division, Boise, ID, for defendant.

Raymond C. Givens, Brian J. Cleary, Givens, Funke & Work, Coeur d'alene, ID, for Plaintiff-Intervenor.

## MEMORANDUM DECISION AND ORDER

LODGE, District Judge.

### I. Introduction

This case involves a dispute over the ownership of the bed and banks of Coeur d'Alene Lake and the St. Joe River (the "submerged lands") lying within the exterior boundaries of the present-day Coeur d'Alene Indian Reservation. The United States of America acting in its own capacity and as trustee for the Coeur d'Alene Tribe of Idaho (the "Tribe") initiated the current action against the State of Idaho seeking to quiet title to the submerged lands for the benefit of the Tribe and its members. In addition to its title claim, the United States prays for a declaratory judgment to establish the Tribe's exclusive use, occupancy and right to the quiet enjoyment of the submerged lands. Finally, the United States seeks a permanent injunction prohibiting the State from asserting any right, title or other interest to such lands.

By leave of the Court, the Tribe intervened to assert independently its beneficial interest in the submerged lands based on the theory of "recognized title" and, alternatively, to claim ownership to the same lands pursuant to unextinguished "aboriginal or Indian title." The State answered and counterclaimed, requesting that the title of the submerged lands be quieted in favor of Idaho. The matter was then tried before the Court without a jury. The Court's decision is set forth below and constitutes its findings of fact and conclusions of law.

### II. Historical Background

The Tribe once inhabited more than 3.5 million acres in what is now northern Idaho and northeastern Washington. On June 14, 1867, President Andrew Johnson established by Executive Order a reservation for the Tribe. The 1867 reservation consisted for the most part of an area known as Hangman Valley,[1] lying to the southwest of Coeur d'Alene Lake (the "Lake"). The parties dispute whether the 1867 reservation included any portion of the submerged lands within its exterior boundaries but, at most, the reservation embraced only a small sliver of the Lake. The precise boundaries of the 1867 reservation never were established by survey, and the Tribe never formally accepted the reservation as its own.

On July 1, 1873, the Commissioner of Indian Affairs directed a three member Commission to visit non-treaty tribes in Idaho, including the Coeur d'Alenes, for the purpose of inducing the tribes "to abandon their roaming habits and consent to confine themselves within the limits of such reservation or reservations as may be designated for their occupancy." Ex. 309 at 1; Ex. 234 at 17, 385. As the result of negotiations between the Commission and the Tribe, an agreement was reached which entitled the Tribe to a reservation of approximately 598,000 acres and compensation for the relinquishment of all claims to the remainder of its aboriginal lands.

The reservation boundaries established by the 1873 agreement embraced the Hangman Valley, the Coeur d'Alene River (from its mouth to the Coeur d'Alene Mission of the Sacred Heart[2]), the St. Joe River (from its mouth to the present site

---

1. The area known as Hangman Valley also is referred to in various exhibits as Hangman Creek Valley or Latah Valley or Paradise Valley or Palouse Valley.

2. The Coeur d'Alene Mission of the Sacred Heart is popularly known today as the Cataldo Mission. Historically, it also has been called the Sacred Heart Mission or the Old Coeur d'Alene Mission.

of St. Maries), and all but a small portion of the Lake. As such, the 1873 reservation included within its boundaries not only the area set aside by the 1867 Executive Order but also the Lake and other waterways as well as additional tracts of land. The 1873 agreement, however, required approval by Congress before it became binding on the parties.

In a letter dated November 4, 1873, the Commissioner of Indian Affairs advised the Secretary of Interior of the 1873 agreement and recommended that "pending the action of Congress upon said agreement ... the President ... issue an Executive Order setting apart the same for the use of said Indians." Ex. 3240. On November 8, 1873, President Ulysses S. Grant established by Executive Order a reservation for the Tribe that mirrored exactly the legal boundaries delineated in the 1873 agreement:

It is hereby ordered that the following tract of country in the Territory of Idaho be, and the same is hereby, withdrawn from sale and set apart as a reservation for the Coeur d'Alene Indians in said Territory, viz:

Beginning at a point on the top of the dividing ridge between Pine and Latah (Hangmans) Creeks, directly south of a point on said last-named creek 6 miles above the point where the trail from Lewiston to Spokane Bridge crosses said creek; thence in a northeasterly direction in a direct line to the Coeur d'Alene Mission on the Coeur d'Alene River (but not to include the lands of said mission); thence in a westerly direction in a direct line to the point where the Spokane River heads in or leaves the Coeur d'Alene Lakes; thence down along the center of the channel of said Spokane River to the dividing line between the Territories of Idaho and Washington as established by the act of Congress organizing a Territorial government for the Territory of Idaho; thence south along said dividing line to the top of the dividing ridge between

Pine and Latah (or Hangmans) Creeks; thence along the top of said ridge to the place of beginning.

Ex. 275 at 72. Although a purpose of the Executive Order was to temporarily set aside the reservation "pending the action of Congress," the 1873 agreement never was ratified by Congress.

The United States conducted a survey of the reservation in 1883. Once the boundaries had been established, Congress sought to extinguish the Tribe's aboriginal title to lands outside the reservation. In 1886, Congress authorized the Secretary of the Interior to negotiate with the Tribe "for the cession of their lands outside the limits of the present Coeur d'Alene reservation." Ex. 649. In 1887, the Tribe and representatives of the United States reached an agreement in which the Tribe ceded

all right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation.

Ex. 215 at 68. The 1887 agreement provided that it "shall not be binding on either party until ratified by Congress." Id. at 69.

Before it had ratified the 1887 agreement, Congress authorized the Secretary of the Interior "to negotiate with the Coeur d'Alene tribe of Indians for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell." Ex. 2288 at 1002. The resulting negotiations lead to an agreement in 1889, in which the Tribe ceded the approximate northern third of the 1873 reservation to the United States. The portion of the reservation subject to the 1889 cession included within its boundaries the approximate northern two-thirds of the Lake. The 1889 agreement provided that it was "not

binding on either party until ratified by Congress." Ex. 215 at 14.

Prior to congressional ratification of the 1887 and 1889 agreements, Idaho was admitted into the Union. As part of that process, Congress enacted the Idaho Statehood Act, which "accepted, ratified, and confirmed" the Idaho State Constitution. Ex. 221 at 215. The state constitution contains a section disclaiming the State's "right and title to the unappropriated public lands" and lands "owned or held by any Indians or Indian tribes." Ex. 2294 at 415. Shortly after Idaho secured statehood, Congress, on March 3, 1891, ratified the 1887 and 1889 agreements.

With two exceptions, the boundaries of the Coeur d'Alene Reservation remain the same today as established by the congressional ratification of the 1887 and 1889 agreements. In 1894, the Tribe agreed to cede to the United States a one-mile wide strip of the reservation, running from the mouth of the Coeur d'Alene River to the reservation's eastern boundary (the "Harrison cession"). And in 1908, Congress authorized the conveyance to the State of Idaho of land surrounding three small lakes, adjacent to the southern extreme of the Lake. Following its transfer by patent to the State of Idaho in 1911, this area became a public park ("Heyburn State Park").

### III. Legal Framework

The United States and the Tribe (collectively, "the Plaintiffs") allege that the Executive Order of 1873 setting apart the reservation also reserved for the benefit of the Tribe the bed and banks of the Lake and other navigable waterways lying within the outer boundaries of the reservation. According to the Plaintiffs, Congress intended to retain, for the benefit of the Tribe, title to the submerged lands included within the reservation created by the 1887 and 1889 agreements.[3] In contrast, the State maintains that under the "equal

footing" doctrine title to all submerged lands within the exterior boundaries of the 1873 reservation passed to the State of Idaho on July 3, 1890, when Idaho was admitted into the Union.

■ The United State Supreme Court recently articulated the legal principles relevant to resolving a dispute over the ownership of submerged lands. In *United States v. Alaska*, 521 U.S. 1, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997), the Supreme Court emphasized the critical connection between the ownership of submerged lands and a State's sovereignty: "Ownership of submerged lands—which carries with it the power to control navigation, fishing, and other public uses of water—is an essential attribute of sovereignty." *Id.* at 1892; *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 2041–42, 138 L.Ed.2d 438 (1997). For this reason, and in order to maintain an "equal footing" with the original 13 colonies, a State is presumed upon admission to the Union to "succeed to the United States' title to the beds of navigable waters within [its] boundaries." *Alaska*, 117 S.Ct. at 1892. Accordingly, " '[a] court deciding a question of title to the bed of navigable water must ... begin with a strong presumption' against defeat of a State's title." *Id.* at 1906 (quoting *Montana v. United States*, 450 U.S. 544, 552, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)).

Under the Constitution, however, the Federal Government can defeat a future State's title to land underlying navigable waters. The Property Clause, Art. IV, § 3, cl. 2, provides Congress with the power to dispose of submerged lands in pre-statehood territories by "granting submerged lands to private parties" or by reserving "submerged lands under federal control." *Id.* The congressional exercise of this power will not offend the Constitution so long as the conveyance or reservation is

---

**3.** The United States' claims are specifically limited to the submerged lands included within the exterior boundaries of the present-day Coeur d'Alene Reservation. The Court by prior order denied the Tribe's request to broaden the quiet title action.

for "an appropriate public purpose." *Id.* at 1909. In this case, there is no doubt that the United States' alleged retention of the submerged lands for the benefit of the Tribe would serve an appropriate public purpose. *See id.* at 1907. The issue instead is whether the Federal Government in fact acted to reserve the disputed submerged lands.

■ In this regard, the question of "[w]hether title to submerged lands rests with a State ... is ultimately a matter of federal intent." *Id.* In the least difficult case, the Federal Government's intent to defeat the future State's title is made clear by "an express reference to the bed beneath the waters ... in the grants establishing the reservation." *United States v. Aranson,* 696 F.2d 654, 664 (9th Cir.) (citing *Montana,* 450 U.S. at 552, 101 S.Ct. 1245), *cert. denied,* 464 U.S. 982, 104 S.Ct. 423, 78 L.Ed.2d 358 (1983). When the pertinent documents do not make express reference to the bed and banks, a conveyance or reservation may be implied but a court "will not infer an intent to defeat a future State's title to inland submerged lands 'unless the intention was definitely declared or otherwise made very plain.'" *Alaska,* 117 S.Ct. at 1906 (quoting *United States v. Holt State Bank,* 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465 (1926)). Thus, the intent of the Federal Government to retain submerged lands may be demonstrated by an express statement or may be inferred from relevant evidence.

In a case such as this one, where it is alleged that the submerged lands were included within an Executive reservation, the inquiry as to federal intent involves three distinct questions. First, whether the actions of the Executive reflected a clear intent to include submerged lands within the reservation. *See id.* at 1907–09. Second, whether Congress authorized the Executive retention of the submerged

lands or ratified the same. *See id.* at 1910–11. Third, and finally, whether Congress intended to defeat the future State's title to those lands. *See id.* at 1909–10. Evidence that bears directly on the resolution of these three questions includes (1) the language of the relevant documents, (2) the location of the reservation boundaries in relation to the submerged lands, and (3) the purpose of the reservation. *See, e.g., id.* at 1908. In contrast, evidence consisting solely of "the 'mere fact that the bed of a navigable water lies within the boundaries'" of a reservation will not overcome the presumption against defeat of a State's title. *Id.* at 1907 (quoting *Montana,* 450 U.S. at 554, 101 S.Ct. 1245).

■ Special evidentiary considerations apply when it is alleged that an Executive reservation implements an agreement between the United States and a tribe. Specifically, Ninth Circuit cases have formulated a three-part test that bears on the first inquiry under *Alaska* as to whether the Executive intended to include submerged lands within the reservation. In an effort to give effect to the "principle of construction resolving any ambiguities in agreements with the United States in favor of the Indian tribes," Ninth Circuit decisions have allowed a plaintiff to establish federal intent on this issue by showing (1) the reservation included "within its boundaries a navigable water," (2) the tribe depended on the watercourse for a significant portion of the tribe's needs; and (3) the "Government was plainly aware of the vital importance of the submerged lands and the water resource to the tribe at the time of the [reservation]." [4] *Muckleshoot Indian Tribe v. Trans–Canada Enter., Ltd.,* 713 F.2d 455, 457 (9th Cir. 1983) (quoting *Puyallup Indian Tribe v. Port of Tacoma,* 717 F.2d 1251, 1258 (9th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984)), *cert.*

---

4. The Ninth Circuit has noted more than once that by articulating the three-part test it did not "mean to imply that only where these conditions are met is a conclusion that the

United States granted the bed of a navigable water to an Indian tribe justified." *Muckleshoot Indian Tribe,* 713 F.2d at 458 n. 2.

*denied,* 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984); *see also United States v. Aam,* 887 F.2d 190, 194, 196–97 (9th Cir.1989). *But see United States v. Pend Oreille Pub. Util. Dist. No. 1,* 926 F.2d 1502, 1510–11 (9th Cir.) (holding that tribal dependence upon a river and the United States' awareness of dependence is not enough to establish federal intent to retain submerged lands for benefit of tribe), *cert. denied,* 502 U.S. 956, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991).

Even if successful in satisfying the three-part test, and therefore demonstrating the Executive intent to reserve submerged lands, the plaintiff also must show that Congress authorized or ratified the Executive reservation and that Congress intended to defeat the future State's title to the submerged lands. *See Alaska,* 117 S.Ct. at 1909–11; *Utah Div. of State Lands v. United States,* 482 U.S. 193, 202, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987). The necessity of establishing congressional awareness and approval of an Executive decision to reserve submerged lands rests on the relationship between the "equal footing" doctrine and the allocation of federal power under the Constitution. The power of the Federal Government to defeat a future State's equal footing title resides ultimately with Congress.[5] *See, e.g., Alaska,* 117 S.Ct. at 1906, 1910–11 (stating that pursuant to the Property Clause Congress can reserve submerged lands under federal control); *Utah Div. of State Lands,* 482 U.S. at 200–01, 107 S.Ct. 2318 (explaining that the power to defeat a future State's title to submerged lands arises out of Congress' power under the Property Clause).

### IV. Findings of Fact and Conclusion of Law

During a trial lasting nine days, the parties to this action presented evidence on the pertinent legal issues in the form of expert and lay testimony, written reports, scientific studies and historical documents. Having heard and/or reviewed all of the evidence, the Court sets forth its findings of fact and conclusions of law.

### A. Executive Actions Reflect a Clear Intent to Include the Submerged Lands Within the 1873 Reservation.

■ Applying the three-part test developed by the Ninth Circuit in *Puyallup Indian Tribe,* 717 F.2d at 1258, to the trial evidence, the Court finds that the first question under *Alaska*—whether the Executive intended to reserve the submerged lands—must be answered in the affirmative.

### 1. The reservation includes within its boundaries land under navigable waters.

The parties agree that the disputed submerged lands lie within the exterior boundaries of the present-day Coeur d'Alene Reservation. Similarly, the State does not contest the fact that the Lake and associated waterways are navigable bodies of water. After considering the evidence presented at trial, the Court finds that the Lake and the relevant portions of the Coeur d'Alene, St. Joe and Spokane Rivers were at all times navigable watercourses and that the Coeur d'Alene Reservation includes within its boundaries the disputed submerged lands. Test. of Hart, Tr. at 282–89; Test. of Fahey, Tr. at 1027–30, 1034; Ex. 209 at 47; Ex. 1319 at 1–4; Ex. 2310; Ex. 2313.

### 2. The Tribe depended on the Lake and associated waterways for a significant portion of the Tribe's needs.

The Coeur d'Alene Indians have occupied the area adjacent to the Lake and the Coeur d'Alene, St. Joe and Spokane Rivers

---

**5.** In the *Muckleshoot* and *Puyallup* cases the Ninth Circuit panels assumed that once the plaintiff demonstrated an Executive intent to include submerged lands within the reservation the ownership issue had been resolved. *See Muckleshoot Indian Tribe,* 713 F.2d at 457–458; *Puyallup Indian Tribe,* 717 F.2d at 1260–61 & n. 10. Subsequent Supreme Court cases have shown this to be an erroneous assumption. *See, e.g., Alaska,* 117 S.Ct. at 1906, 1910–11; *Utah Div. of State Lands,* 482 U.S. at 200–02, 107 S.Ct. 2318.

since time immemorial. The Tribe traditionally survived by fishing, hunting and gathering. For the reasons set forth below, the Court finds the Lake and associated waterways were essential to the Tribe's traditional lifestyle.

Historically, the Coeur d'Alene Indians lived in a number of villages located around the Lake and along the rivers. The Tribe consumed resident trout and whitefish year-round.[6] The resident fishery was a main staple of the Tribe's diet. Among other methods of fishing, the Coeur d'Alenes constructed fish traps and weirs which were anchored in the bed and banks of the watercourses. In some cases these structures were extensive, spanning the width of a river. Surplus fish were sometimes dried for later use or traded to other tribes. Occasionally, tribal members also harvested crayfish and freshwater mussels. Test. of Hart, Tr. at 43–73; Hart Report (Ex. 1437) at 5–28; Test. of Sprague, Tr. at 745–763, 765–69, 785; Sprague Report (Ex. 2404) at 31–33; Ex. 33 at 132–33, 148; Ex. 64 at 7; Ex. 115 at 38–41; Ex. 132 at 17–18; Ex. 133 at 37–38; Ex. 137 at 175–76; Ex. 139 at 10; Ex. 145 at 130–33; Ex. 171 at 38–40, 55, 88, 94–95, 105–07; Ex.2030 at 104–16; Ex. 2272.

The Lake and associated rivers were commonly used to facilitate hunting activities. During communal hunts, deer were driven into a waterway and large numbers, sometimes hundreds, were killed by tribal members waiting in ambush. The Coeur d'Alenes also depended on the waterways to hunt small game, such as beaver, as well as migratory waterfowl. Test. of Hart, Tr. at 72–75; Hart Report (Ex. 1437) at 28–30; Test. of Sprague, Tr. at 769–75; Sprague Report (Ex. 2404) at 35–36; Ex. 105 at 27; Ex. 133 at 38–39; Ex. 171 at 101–03; Ex. 2271; Ex. 2271.

The Tribe gathered several plants growing in the marshes and wetlands of the Coeur d'Alene waterways. Most important among these was the water potato, a plant that was gathered annually by tribal members from the shallow waters of the Lake and rivers. The Coeur d'Alenes also collected rushes and tule from alongside the waterways for use in the construction of baskets, mats and the Tribe's lodges. Test. of Hart, Tr. at 80–81; Hart Report (Ex. 1437) at 33–36; Test. of Sprague, Tr. at 777, 790; Sprague Report (Ex. 2404) at 33–34.

The watercourses provided the primary highways for travel, trade and communication. Canoes were prevalent and constructed in several distinct styles. Travel was measured in the days it took a canoe to get from point to point. Canoes also facilitated the Tribe's fishing and hunting activities. Test. of Hart, Tr. at 76–77; Hart Report (Ex. 1437) at 30–33; Test. of Sprague, Tr. at 780–85; Sprague Supplemental Report (Ex. 2405) at 3–6.

The Lake and rivers played an integral part in the Tribe's cultural activities. The waterways were tied to the Tribe's recreational pursuits, religious ceremonies and burial practices. In this respect, the Lake and rivers served not only as the means by which the Tribe ensured its corporeal survival, but also as the source of the Tribe's spiritual and cultural identity. Test. of Hart, Tr. at 81–87; Hart Report (Ex. 1437) at 34, 36–43; Test. of Sprague, Tr. at 786–89, 797–800; Sprague Report (Ex. 2404) at 48–50; Ex. 112 at 88–94.

The Tribe augmented its year-round dependence on the water resource by engaging in seasonal subsistence activities. In summer, the Coeur d'Alenes harvested camas, a plant yielding a fleshy bulb. Hangman Valley was the site of extensive camas

---

**6.** Spokane Falls, on the Spokane River, prevented salmon and other anadromous fish from migrating upstream into the Coeur d'Alene drainage system. However, a salmon run did reach upper Hangman Creek. Tribal members also sometimes harvested salmon outside the Tribe's aboriginal territory. But the total contribution to the Tribe's diet was minimal; it is estimated the Coeur d'Alenes obtained less than 5 percent of their total caloric intake from salmon. Ex. 1435 at 18.

fields and therefore an important area within the Tribe's aboriginal territory. Tribal members also harvested berries throughout the summer as they ripened at successive elevations. Test. of Sprague, Tr. at 776–78; Sprague Report (Ex. 2404) at 33; Ex. 133 at 21; Ex. 171 at 88–93

With the advent of the horse, some tribal members traveled to the Plains during the late fall to participate in an annual buffalo hunt. In this regard, the acquisition of the horse reduced somewhat the Tribe's reliance on fishing and small game hunting. Cox Report (Ex. 1437) at 11; Ex. 33 at 142–46; Ex. 171 at 151–52. However, the majority of Coeur d'Alenes continued to live along the waterways and engage in a traditional subsistence lifestyle. The pastoral influence arising from the introduction of the horse and buffalo hunt most significantly affected the villages located near the Spokane (Rathdrum) Prairie, but even at these sites tribal members continued to depend on the water resource.[7] Test. of Hart, Tr. at 87–89; Test. of Sprague, Tr. at 779–80, 804–07; Test. of Cox, Tr. at 1537–40,1574–75; Cox Report (Ex. 1437) at 12, 14–17, 27–28; Power Report (Ex. 2325) at 3–4; Ex. 26 at 10, 189–90; Ex. 33 at 145–46; Ex. 137 at 175–76; Ex. 232 at 710–11.

By the 1840's, the Coeur d'Alenes had begun to cultivate small garden plots, rarely exceeding an acre or two. The primary crops were potatoes and wheat. While the Tribe's agricultural endeavors augmented its traditional lifestyle, it did not supplant the Tribe's dependence on the waterways for a steady source of fish, fowl and plants. The limited quantities and seasonal availability of garden produce served at most as a supplement to the continuous and stable source of food and fibre provided by the water resource. Test. of Hart, Tr. at 145–46; Test. of Sprague, Tr. at 793, 833; Sprague Supplemental Report (Ex. 2405) at 3; Test. of Power, Tr. at 1489–92; Test. of Cox, Tr. at 1541–46, 1576–79; Cox Report (Ex. 1437) at 19–20, 23, 25; Ex. 101 at 158–61, 204; Ex. 2275 at 30; Ex. 2358 at 68, 73.

To summarize, the majority of the Tribe's population lived in villages located next to the Lake and rivers. The Tribe's proximity to the watercourses was no coincidence; the Lake and rivers provided resources that were essential to the Coeur d'Alenes' survival. The Tribe depended on the waterways for a year-round source of fish, small mammals, waterfowl and plant materials. The Tribe also depended on the waterways to facilitate the harvest of large mammals and to serve as a means of efficient transportation. Finally, the Tribe's spiritual, religious and social life centered around the Lake and rivers.

The Court's findings are based in part on the expert testimony of Mr. Richard Hart, Dr. Roderick Sprague, Dr. Thomas Power and Dr. Thomas R. Cox.[8] The opinions of these witnesses were well within their respective areas of expertise, supported by the documentary evidence and were not diminished on cross-examination. In addition, the Court's findings are supported by the various scientific studies and oral histories submitted by the parties. Archaeological, ethnographic and linguistic studies, as well as tribal traditions and histories, confirm that the Coeur d'Alenes located the majority of their villages along the Lake and rivers, and relied on the water resource to ensure their survival.

7. The State contends that following the acquisition of the horse many tribal members relocated from stream side villages to open, grassy areas, adopted pastoralism, and abandoned the Tribe's traditional subsistence lifestyle. The weight of the evidence demonstrates, however, that the majority of Coeur d'Alenes continued to live along the waterways and depend on the water resource for food, fibre and transportation.

8. The State introduced the expert testimony and report (Ex. 3235) of Dr. Kent D. Richards to show that the Tribe was not dependent on the Lake and rivers. However, Dr. Richards' opinions on this issue were significantly undermined on cross-examination and, in any event, the great weight of the evidence is to the contrary.

Based on the above findings, the Court concludes that the Tribe depended on the Lake and associated rivers for a significant portion of its needs. *Cf. Aam,* 887 F.2d at 196–97. The waterways were essential to the Tribe's livelihood, providing a reliable year-round source of food and fibre. *See Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *Puyallup Indian Tribe,* 717 F.2d at 1259; *cf. Skokomish Indian Tribe v. France,* 320 F.2d 205, 210–12 (9th Cir. 1963), *cert. denied,* 376 U.S. 943, 84 S.Ct. 797, 11 L.Ed.2d 767 (1964). Furthermore, the Coeur d'Alenes "depended on watercourses, not only for food and materials, but also in their manner of self-identification, language and religious practices." *Muckleshoot Indian Tribe,* 713 F.2d at 458.

**3. At the time of the 1873 Executive reservation, the Federal Government was plainly aware of the vital importance of the submerged lands and the water resource to the Tribe.**

At the time of the 1873 Executive reservation, the Federal Government was plainly aware of the Tribe's dependence on the Lake and rivers. As discussed in detail below, the evidence shows that in 1873 the majority of tribal members continued to rely on the water resource for a significant portion of their needs. Moreover, events immediately preceding and following the 1873 agreement demonstrate that government officials were made aware of the Tribe's reliance on the waterways. The fact that the boundaries of the reservation, as determined by the 1873 agreement and endorsed by the Executive Order, were drawn to include the Lake and rivers leads the Court to conclude that a purpose of the 1873 Executive reservation was to retain the submerged lands for the benefit of the Tribe.

**(a) The Tribe continued to be dependent on the water resource in 1873.**

Non–Indian contact with the Tribe increased through the early and middle 1800's. Of particular importance to the Coeur d'Alenes was the arrival of Jesuit missionaries in 1842. During the next fifty years, the Jesuits exerted considerable influence over the Tribe's cultural development, often acting as advisors to the Tribe in its dealings with the Federal Government. In numerous and detailed recorded accounts, the Jesuit priests described the Tribe's traditional reliance on the Lake and rivers. Test. of Hart, Tr. at 92–110; Hart Report (Ex. 1437) at 52–68, 91–93; Test. of Sprague, Tr. at 747–48; Sprague Report (Ex. 2404) at 52–54.

In 1846, the Jesuits established the Mission of the Sacred Heart on the Coeur d'Alene River and with the help of tribal members began farming. Eventually, the Mission's farm totaled 200 acres. The agricultural production from the Mission farm, however, did not play a significant role in the Coeur d'Alenes' diet. Test. of Hart, Tr. at 164, 518–19, 1615–16; Hart Report (Ex. 1437) at 99; Test. of Sprague, Tr. at 804–06; Ex. 60 at 61–64; Ex. 1147 at 1–2; Ex. 2221 at 159; Ex. 2265 at 997; Ex. 2358 at 78–86. While many of the federal officials that interacted with the Coeur d'Alenes during the 1850's and early 1860's commented on the Tribe's agricultural efforts, they also noted the Tribe's use of the Lake and rivers. Hart Report (Ex. 1437) at 69–73, 87–91, 96–98; Ex. 100 at 84; Ex. 168 at 135, 147–48; Ex. 208 at 372; Ex. 2222 at 366–68; Ex. 2338 at 30, 42, 49; Ex. 2409; Ex. 3029 at 36–40; Ex. 3033.

After completion of the Mullan Road in 1862, the Mission experienced an influx of emigrants, miners and other travelers. This proved to be the beginning of a gradual invasion of the Tribe's aboriginal territory. In 1867, apprehension over the effect of the Tribe's aboriginal title on non-Indian ownership claims prompted the President to establish a reservation for the Coeur d'Alenes. The 1867 reservation consisted for the most part of the area known as Hangman Valley and included only a small sliver of the Lake. Test. of

Hart, Tr. at 132–33, 146–61; Hart Report (Ex. 1437) at 94–101, 102–07; Ex. 118 at 24–25; Ex. 227 at 192; Ex. 228 at 417–18; Ex. 239.

Apparently unaware of the 1867 Executive reservation, the Tribe in November of 1871 sent a petition to the Commissioner of Indian Affairs requesting a "charter to possess 20 or 25 miles square of land exclusively for us." Ex. 3066. The petition describes the relevant tract of land as "[t]hat-basin on both sides of Hang-man-creek called: Paradise Valley." *Id.* This description corresponds to the area known as Hangman Valley.

In late 1871 or early 1872, the Coeur d'Alenes became aware of the 1867 reservation and expressed their dissatisfaction with its boundaries. Ex. 307; Ex. 234 at 392. On November 18, 1872, tribal leaders sent a second petition to the Commissioner of Indian Affairs stating in part as follows:

> In our first petition we made no mention of our church nor of the two valleys of S. Joseph and Coeur d'Alene rivers, because in our ignorance we thought it a matter of course. . . .
>
> As to the two valleys, we did not think to ask for them, though they have been from old the habitual residence of most of us; because being every spring under water, we thought no white man could ever settle there in fact there is none as yet: the few spots which usually escape being inundated, we have them fenced in and cultivated. What we are unanimous in asking, besides the 20 square miles already spoken of, are the two valleys, the S. Josephs, from the junction of S. and N. forks, and the Coeur d'Alene from the Mission inclusively. It would appear too much, and it would be so if all or most of it were fit for farming but the far greatest part of it is either rocky

or too dry, too cold or swampy; besides we are not as yet quite up to living on farming: with the work of God we took labor too, we began tilling the ground and we like it: though perhaps slowly we are continually progressing; but our aided industry is not as yet up to the white man's. We think it hard to leave at once old habits to embrace new ones: for a while yet we need have some hunting and fishing.

Ex. 300.[9] The second petition makes three points relevant to the Court's present inquiry. First, the Tribe never entertained the possibility of withdrawing to a reservation that did not include the river valleys. Second, the Tribe considered the area adjacent to the waterways its home. Third, and most important, in 1872 the Tribe continued to rely on the water resource for a significant portion of its needs. *Id.*

While the second petition makes clear the Tribe's continuous reliance on the Lake and rivers, other sources reporting on the Tribe's economic status during the late 1860's and early 1870's offer conflicting assessments. Several reports emphasize the Tribe's commitment to farming, Ex. 233 at 726; Ex. 303; Ex. 3239; Ex. 3245, while other accounts note the Tribe's continued reliance on fishing, Ex. 305; Ex. 232. Most important among the latter is a letter from David P. Thompson to the Commissioner of the General Land Office, dated May 6, 1873, urging that the 1867 reservation be enlarged to include the waterways because "[s]hould the fisheries be excluded there will in my opinion be trouble with these indians but should they be included and also the mission which should also be in the Reservation there will be no trouble."[10] Ex. 305. Also significant is the 1871 Agent report by W.P. Winas, observing that: "The Coeur d'Alenes reside on Spokane Prairie, and their number

---

9. After considering all the evidence, the Court finds that the second petition was received by the Department of Interior on March 7, 1873. Ex. 2351; Test. of Richards, Tr. at 1427–33.

10. In his letter, Thompson states that his information comes from Rev. Father Cataldo, who he "knows . . . represents the views of the Indians." Ex. 305. Thompson's letter eventually was forwarded to the Commissioner of Indian Affairs. Ex. 306.

living in this Territory is about one hundred and fifty. They farm on a small scale, but subsist principally by hunting and fishing." [11]  Ex. 232 at 711.

Having considered all the evidence, the Court finds that at the time of the Executive reservation in 1873 the Tribe continued to be dependent on the Lake and rivers. Reports describing the Tribe's agricultural successes are in conflict with other official assessments, are not necessarily based on personal knowledge, and may be tainted by cultural and personal bias. Depictions of agricultural activity most likely are based on the Tribe's maintenance of garden plots, horses and, in some cases, cattle. Estimates of farmed acreage and agricultural output demonstrate that in the early 1870's the Coeur d'Alenes were not engaged in systematic farming practices. Test of Hart, Tr. at 524–25, 539–43, 1609–15, 1620–23; Test. of Sprague, Tr. at 830–33; Test. of Power, Tr. at 1480–92, 1496–1500; Power Report (Ex. 2325) at 4–8; Test. of Cox, Tr. at 1556–57; Cox Report (Ex. 1437) at 25; Ex. 232 at 711; Ex. 2340; Ex. 3034.

In this regard the Court rejects the State's contention that the "Big Move" to the Hangman Valley area occurred in the late 1860's and early 1870's, and that by 1873 the Tribe had converted to an agrarian based society, no longer dependent on the Lake and rivers. All competent evidence shows that the Tribe's "Big Move" to Hangman Valley started sometime after 1873 and that the Tribe's sole reliance on systematic agricultural practices did not become a reality until much later. *E.g.,* Test of Hart, Tr. at 88–89, 1627–28; Ex. 60 at 61–69; Ex. 206 at 42, 44; Ex. 240 at 250; Ex. 243 at 212; 214; Ex. 245 at 205–06; Ex. 1147 at 1–21.

Other evidence indicates that in 1873 the Tribe continued to depend on the water resource for a significant portion of its needs. Ex. 305; Ex. 232 at 711. Most important, the second petition provides the Tribe's own assessment of its ability to live without the resources provided by the Lake and rivers. In no uncertain terms, the Coeur d'Alenes made it be known that their continued reliance on the waterways was necessary to ensure their survival. Ex. 300.

Based on all the above, the Court concludes that in 1873 the Lake and rivers were an essential part of the "basket of resources" necessary to sustain the Tribe's livelihood. While tribal members also engaged in gardening, gathering and hunting, the waterways provided a reliable, year-round source of food, fibre and transportation without which the Tribe could not have survived. *Alaska Pacific Fisheries,* 248 U.S. at 89, 39 S.Ct. 40; *Puyallup Indian Tribe,* 717 F.2d at 1259; *Muckleshoot Indian Tribe,* 713 F.2d at 458; *cf. Aam,* 887 F.2d at 196–97; *Skokomish Indian Tribe,* 320 F.2d at 209.

**(b) The Federal Government was plainly aware of the Tribe's dependence on the Lake and rivers at the time of the Executive reservation in 1873.**

On July 1, 1873, the Commissioner of Indian Affairs directed a three member Commission to visit non-treaty tribes in Idaho, including the Coeur d'Alenes, for the purpose of inducing the tribes "to abandon their roaming habits and consent to confine themselves within the limits of such reservation or reservations as may be designated for their occupancy." Ex. 309 at 1; Ex. 234 at 17, 385. The Commission members included J.P.C. Shanks, chairman of the House Committee on Indian Affairs, Thomas Bennett, Territorial Governor of Idaho, and John Monteith, Agent to the Nez Perce Indians. The Commission arrived at the Lake on July 23, 1873, spent two days examining the boundaries of the proposed reservation, and met in

---

**11.** Significantly, tribal members living on the Spokane Prairie were from that portion of the Tribe most willing to adopt an agrarian based lifestyle. *See, e.g.* Test. of Sprague, Tr. at 804–06; Test. of Cox, Tr. at 1537–40, 1574–75; Cox Report (Ex. 1437) at 12, 14–17, 27–28.

council with the Tribe on July 25, 26 and 27. An agreement was signed on July 28, 1873. Ex. 315; Ex. 645.

The agreement called for setting aside a significantly larger portion of the Tribe's aboriginal territory than had been reserved by the 1867 Executive Order. Besides Hangman Valley, the boundaries of the proposed reservation enclosed all but a small portion of the Lake, the Coeur d'Alene River, from its mouth to the Sacred Heart Mission, the St. Joe River, from its mouth to the present-day site of St. Maries, and a tract of land lying to the south of the Spokane River. The precise boundaries of the expanded reservation were identified by reference to a legal description. Under the agreement, the eastern boundary of the reservation was to head north "in a direct line, to the Coeur d'Alene Mission, on the Coeur d'Alene river (but not to include the lands of said Mission)," with the northern boundary heading "thence in a Westerly direction, in a direct line, to the point where the Spokane River heads in or leaves the Coeur d'Alene lake; thence down along the center of the channel of said Spokane River to the dividing line between the Territories of Idaho, and Washington." In addition to expanding the boundaries of the reservation to include the Lake and rivers, the agreement also guaranteed "that the water running into said reservation shall not be turned from their natural channel where they enter said reservation." In exchange for this enlarged reservation, and other compensation, the Tribe agreed to relinquish all claims to the remainder of its aboriginal lands. The agreement provided that it was not binding on the parties until ratified by Congress. Ex. 645.

In a letter to the Commissioner of Indian Affairs, dated August 6, 1873, Agent Monteith listed four reasons for enlarging the boundaries of the 1867 reservation: first, an adjustment in the southwest boundary would include "several Indian

farms" and exclude "four places belonging to white settlers;" second, running the eastern boundary north to the Mission "will leave some good farming land in the Upper Latah and will take in several farms around the new Mission on the Coeur d'Alene river;" third, "by running down the Spokane [the Tribe] can put the mills at the upper falls at much less expense than building a steam mill;" and fourth, "[b]y following the Washington and Idaho line to the dividing ridge between the Latah and Pine Creek it will include all Indian farms in Idaho and leave out all white settlements." Ex. 315. Although three of the four reasons for expanding the reservation focus on the location of agricultural lands, other than the specific areas identified by Monteith, the majority of the expanded reservation was not suitable for farming.[12] Ex. 300; Ex. 305; Ex. 2316(B).

In response to public criticism, Governor Bennett also sought to justify the Commission's decision to agree to an enlarged reservation. In a letter to the *Idaho Signal*, dated October 4, 1873, Governor Bennett stated: "We found that the Indians *demanded* an extension of their reservation so as to include the Catholic Mission and fishing and mill privileges on the Spokane River." Ex. 704 (emphasis in original).

On November 4, 1873, the Commissioner of Indian Affairs sent a letter to the Secretary of Interior that described the boundaries of the proposed reservation and then stated:

In order that the tract thus described may be protected from trespass by white persons pending the action of Congress upon said agreement, I have the honor to recommend that the President be requested to issue an Executive Order setting apart the same for the use of said Indians.

Ex. 3240. Incorporating the legal description from the 1873 agreement, President

12. Much of the land added by the 1873 agreement was later characterized by the Federal Government as not suitable for agriculture. Ex. 213 at 4, attach; Ex. 215 at 2, 4.

Ulysses S. Grant, on November 8, 1873, "ordered that ... the same is hereby withdrawn from sale and set apart as a reservation for the Coeur d'Alene Indians." Ex. 275 at 72.

In 1883, the Federal Government surveyed the boundaries of the 1873 reservation. Consistent with the description of the boundaries set forth in the 1873 agreement and adopted by the Executive Order, the instructions to the surveyor directed him to run the northern boundary across the Lake from the Sacred Heart Mission to the head of the Spokane River. By locating the northern boundary across the Lake, a portion of the Lake's north end was excluded from the reservation. Surveying a boundary across a navigable waterway was contrary to the usual practice of meandering a survey line along the mean high water mark. The 1883 survey fixed the reservation's total area at 598,-499.85 acres, a calculation that included submerged lands under the Lake and rivers within the boundaries of the reservation. Test. of Willett, Tr. at 887–99; Hart Report (Ex. 1437) at 354–62; Ex. 213; Ex. 699.

Based on the foregoing, the Court concludes that in 1873 the Federal Government was plainly aware of the Tribe's dependence on the Lake and rivers. As recounted above, from first contact with the Coeur d'Alenes, government officials noted the Tribe's reliance on the water resource. Any uncertainty concerning the extent of the Tribe's dependence on the Lake and rivers in 1873 was dispelled by the Tribe's request in the second petition for inclusion of the waterways in an expanded reservation. Most important, during the 1873 negotiations the Coeur d'Alenes reiterated their demand that the 1867 reservation be enlarged to include the Tribe's traditional fishing grounds. According to Governor Bennett, the expand-

ed boundaries fixed by the 1873 agreement reflected the United States' realization that the Coeur d'Alenes required a reservation that included the Tribe's fishery. Thus, at the time of the 1873 reservation the "Government's Indian agents understood that 'the capture of fish was an essential source of the Indians' food supply.' " [13] *Muckleshoot Indian Tribe,* 713 F.2d at 458; *see also Puyallup Indian Tribe,* 717 F.2d at 1259–61.

The Plaintiffs have established each component of the three-part test developed by the Ninth Circuit in *Puyallup Indian Tribe,* 717 F.2d at 1258. The parties agree, and the Court finds, that the disputed submerged lands lie beneath navigable waters and within the exterior boundaries of the present-day Coeur d'Alene Reservation. The great weight of the evidence demonstrates that in 1873 the Tribe depended on the water resource for a significant portion of its needs. Finally, the evidence shows that the Federal Government was plainly aware of the Tribe's dependence at the time of the Executive reservation. *See Puyallup Indian Tribe,* 717 F.2d at 1259–61; *Muckleshoot Indian Tribe,* 713 F.2d at 456–58; *cf. Aam,* 887 F.2d at 196–97; *Aranson,* 696 F.2d at 666; *Skokomish Indian Tribe,* 320 F.2d at 210–12. By satisfying the *Puyallup* test, the Plaintiffs have successfully demonstrated that the Executive intended to reserve for the benefit of the Tribe the submerged lands within the 1873 reservation. *See Puyallup Indian Tribe,* 717 F.2d at 1258–61; *Muckleshoot Indian Tribe,* 713 F.2d at 457–58.

**(c) Compelling evidence and/or a public exigency supports the conclusion that the Federal Government intended to include the submerged lands within the 1873 reservation.**

At least one Ninth Circuit case holds that in addition to satisfying the *Puyallup*

**13.** Contrary to the State's argument, the Plaintiffs are not required to show that the President, Secretary of Interior or Commissioner of Indian Affairs actually knew of the Tribe's dependence on the waterways. It is necessary only to show that the government's agents involved in the events giving rise to the reservation or grant of the submerged lands were plainly aware of the Tribe's dependence. *See Muckleshoot Indian Tribe,* 713 F.2d at 457–58; *Puyallup Indian Tribe,* 717 F.2d at 1259–61

test a plaintiff must present "compelling evidence" to show a "public exigency" justified the Federal Government's retention of submerged lands for the benefit of a tribe. *Pend Oreille Pub. Util. Dist. No. 1,* 926 F.2d at 1510–11. The United States Supreme Court, however, recently explained that a plaintiff has no such burden. In *Alaska,* the Supreme Court expressly rejected the notion that to succeed on a quiet title action a plaintiff must prove that a "public exigency" supported the reservation of submerged lands. 117 S.Ct. at 1909, 1915.

But even if controlling law required the Plaintiffs to show a "public exigency" existed at the time of the 1873 reservation, there is sufficient evidence to support a finding on this issue. Both the Supreme Court and the Ninth Circuit have held that a tribe's dependence on submerged lands constitutes a "public exigency." *E.g., Montana,* 450 U.S. at 556, 101 S.Ct. 1245; *Aam,* 887 F.2d at 197–98; *Aranson,* 696 F.2d at 666; *Confederated Salish & Kootenai Tribes of Flathead Reservation, Mont. v. Namen,* 665 F.2d 951, 962 (9th Cir.), *cert. denied,* 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982). Because the Plaintiffs in this case have shown that the Tribe's survival was dependent on the retention of the disputed submerged lands, they also have shown that a "public exigency" supported the Executive reservation of those same lands. *See, e.g., Alaska Pacific Fisheries,* 248 U.S. at 89, 39 S.Ct. 40; *Namen,* 665 F.2d at 962; *cf. Montana,* 450 U.S. at 556, 101 S.Ct. 1245.

Furthermore, in this case the evidence is sufficient to establish the existence of other circumstances that also constitute a "public exigency." The facts demonstrate that an influx of non-Indians into the Tribe's aboriginal territory prompted the Federal Government to negotiate with the Coeur d'Alenes in an attempt to confine the Tribe to a reservation and to obtain the Tribe's release of its aboriginal lands for settlement. Before it would agree to these conditions, however, the Tribe demanded an enlarged reservation that included the Lake and rivers. Thus, the Federal Government could only achieve its goals of promoting settlement, avoiding hostilities and extinguishing aboriginal title by agreeing to a reservation that included the submerged lands. Under similar circumstances, courts have found a "public exigency" sufficient to justify the Federal Government's decision to reserve the submerged lands. *See Pend Oreille Pub. Util. Dist. No. 1,* 926 F.2d at 1510–11; *Puyallup Indian Tribe,* 717 F.2d at 1258–61; *Muckleshoot Indian Tribe,* 713 F.2d at 457–58.

Separate and apart from the evidence supporting a "public exigency" and the three-part *Puyallup* test, there is "compelling evidence" demonstrating the Federal Government's intent to reserve the submerged lands for the benefit of the Tribe. *Cf. Pend Oreille Pub. Util. Dist. No. 1,* 926 F.2d at 1510–11 (holding that evidence of tribal dependence upon a river and the United States' awareness of that dependence is insufficient to satisfy plaintiff's burden without additional "compelling evidence" of federal intent to retain submerged lands for benefit of tribe).[14] Under the analysis employed by the Supreme Court in *Alaska,* the language of the relevant documents, the location of the reservation boundaries in relation to the submerged lands and the purpose of the reservation are all highly relevant to ascertaining the intention of the Federal Government. *See, e.g.* 117 S.Ct. at 1908. In this case, evidence relating to each consideration shows that the actions of the Executive reflected a clear intent to include the submerged lands within the reservation.

The Supreme Court's submerged land cases "establish that the fact that naviga-

---

14. The panel's utilization of a "compelling evidence" standard in *Pend Oreille Pub. Util. Dist. No. 1* is an anomaly; no other Ninth Circuit decision and no Supreme Court opinion has ever employed a "compelling evidence" standard in a submerged land case.

ble waters are within the boundaries of a conveyance or reservation does not in itself mean that submerged lands beneath those waters were conveyed or reserved." *Id.* On the other hand, where an Executive order setting aside a reservation does more than "merely define a boundary that encloses a body of navigable water," the description of the reservation's boundaries in relation to the submerged lands may signal an intent to retain federal ownership. *Id.* Here, the 1873 Executive Order uses the Coeur d'Alene River, Spokane River and Lake as reference points for describing the boundaries of the reservation. Moreover, the 1873 agreement guarantees "that the water running into said reservation shall not be turned from their natural channel where they enter said reservation." Ex. 645. Reference to these water features in the 1873 agreement and Executive Order suggests a federal intent to include submerged lands within the reservation. *See Alaska,* 117 S.Ct. at 1908, 1914; *Namen,* 665 F.2d at 962.

Even more important, the 1873 Executive Order expressly describes a northern boundary that runs across the waters of the Lake and down the center of the Spokane River. Fixing a boundary line across a navigable body of water was contrary to the usual practice of meandering a boundary along the mean high water mark. *See Skokomish Indian Tribe,* 320 F.2d at 207. By defining the northern boundary in terms of the waterways, the Executive Order necessarily included within the reservation the lands beneath the Lake and Spokane River lying to the south of the boundary, and excluded from the reservation submerged lands lying to the north of the boundary. "It would have been pointless, and quite likely deceptive, to have the northern boundary of the reservation bi-

sect [the] Lake unless it was intended to convey title to the southern [portion] of that lake to the Indians." *Namen,* 665 F.2d at 962.[15] Significantly, the official survey calculated the reservation's total area at 598,499.85 acres, a figure that included the submerged lands within the reservation boundaries. *Cf. Skokomish Indian Tribe,* 320 F.2d at 209 (stating that failure to include submerged lands in reservation's acreage computation indicates there was no intention to set aside those lands for tribal use). Thus, the clear intent to retain the submerged lands can be found in the 1873 Executive Order, which "by its 'terms embraces the land under the waters of the ... [L]ake.'" *Pend Oreille Pub. Util. Dist. No. 1,* 926 F.2d at 1511 (quoting *Montana,* 450 U.S. at 552, 101 S.Ct. 1245 and citing *Namen,* 665 F.2d at 962); *see also Alaska,* 117 S.Ct. at 1908, 1914.

Under *Alaska,* the purpose of the reservation also "is a critical factor in determining federal intent." 117 S.Ct. at 1908. Looking first to the Executive Order for any statement of purpose, it announces that the area described in the 1873 agreement is "withdrawn from sale and set apart as a reservation for the Coeur d'Alene Indians." Ex. 275 at 72. Focusing on the language of the Executive Order that withdraws the reserved land from sale and on language from an official report that explains the reservation had been set aside "in order that white persons may be prohibited from settling thereon," Ex. 234 at 392; Ex. 3240, the State argues that the Executive Order did not include submerged lands within the reservation because such lands are not subject to sale or settlement. The State reads the Executive Order too narrowly. Although the Execu-

---

**15.** In *Namen* the Ninth Circuit also noted that had the Federal Government "intended not to convey the southern half of the lake to the Indians, it could easily have defined the Reservation's northern boundary, upon reaching the west shore of the lake, as running along the shore of the southern half of [the] Lake." 665 F.2d at 962 n. 28. The same can be said

here: if the intent was to exclude submerged lands from the 1873 reservation, the Federal Government could have defined the northern boundary, upon reaching the Mission, as running along the shore of the southern part of the Lake to the head of the Spokane River. *See* Test. of Willett, Tr. at 899.

tive Order did seek to preclude appropriation of lands within the reservation, it also had a much broader purpose: to create a reservation for the exclusive use of the Tribe "pending the action of Congress upon [the 1873] agreement." Ex. 3240; *see also* Ex. 275 at 72; Ex. 324 at 385. Because the reservation was not designed solely to prevent appropriation of lands, the Court must look to the purpose of the 1873 agreement to determine whether the reservation embraced submerged lands.

In 1873 the Federal Government sought an agreement with the Coeur d'Alenes in order to confine the Tribe to a reservation and extinguish the Tribe's aboriginal title. Ex. 228; Ex. 324 at 385, 392; Ex. 704. The Tribe had refused to settle within the confines of the 1867 reservation. Ex. 307; Ex. 234 at 392. Thus, the Federal Government could only achieve its goals—to extinguish aboriginal title and free tribal lands for settlement—by agreeing to an expanded reservation. In this regard, the Coeur d'Alenes demanded an enlarged reservation that included the Tribe's fishing grounds, a mill site and the Mission. Ex. 300; Ex. 315; Ex. 704. The Tribe's demand for its fishing grounds and a mill site could not be satisfied without an agreement that included within the reservation the land under the Lake and rivers. That the Federal Government did in fact agree to reserve the submerged lands for the benefit of the Tribe is demonstrated by the following factors: 1) the United States was aware that the waterways were essential to the Tribe's livelihood; 2) the boundaries of the enlarged reservation were drawn to include the Lake and rivers; 3) the expanded reservation did not add significantly to the agricultural land base already reserved by the 1867 Executive Order; 4) the description of the reservation's boundaries by its terms embraced the submerged lands; and 5) a member of the

Commission, Governor Bennet, acknowledged that the expansion of the reservation was for the purpose of meeting the Tribe's demand for its fishing grounds and a mill site. *Cf. Skokomish Indian Tribe,* 320 F.2d at 210 (denying tribal title to submerged lands after explaining "that the [Skokomish] reservation was intended only as a residence, and the Indians were to remain free to roam and fish at their usual places").[16] This evidence leads the Court to conclude that a purpose of the 1873 agreement was to provide the Tribe with a reservation that granted tribal members exclusive use of the water resource. Because an object of the 1873 Executive Order was, in part, to create a reservation for the Coeur d'Alenes that mirrored the terms of the 1873 agreement, a purpose of the Executive Order was to reserve the submerged lands under federal control for the benefit of the Tribe. *See, e.g., Puyallup Indian Tribe,* 717 F.2d at 1260–61.

In sum, the intent of the Federal Government to include submerged within the 1873 reservation can be garnered from numerous sources. The evidence supports a finding in favor of the Plaintiffs on each element of the three-part *Puyallup* test. There also is sufficient evidence to demonstrate a "public exigency" existed at the time of the 1873 reservation. In addition, the terms and purpose of the 1873 agreement and Executive Order provide "compelling evidence" of a federal intent to reserve the submerged lands. The Court therefore concludes that the actions of the Executive reflected a clear intent to retain for the benefit of the Tribe the submerged lands within the 1873 reservation.

**B. Congress Ratified the 1873 Executive Reservation of Submerged Lands and Demonstrated a Clear Intent to Defeat Idaho's Title.**

Although a purpose of the Executive Order was to set apart a reservation for

---

**16.** In contrast to the intended purpose of the reservation created for the Indians in *Skokomish Indian Tribe,* here a reason for expanding the reservation to include the Tribe's fishery was precisely so that tribal members could be confined within its boundaries. In-

deed, Commission member Governor Bennet had earlier stated his belief that to avoid conflicts with whites an Indian reservation *must* include the areas relied upon by a tribe for hunting and fishing. *Eg.* Ex. 1346.

the Coeur d'Alene Indians "pending the action of Congress," the 1873 agreement never was ratified by Congress. Nevertheless, the Executive Order effectively conveyed to the Tribe a beneficial interest in the reservation's lands. *Puyallup Indian Tribe,* 717 F.2d at 1261 n. 10. Until Congress approved the Executive reservation, however, the Tribe's property right was "subject to termination at the will of either the executive or Congress." *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 331, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). Similarly, without congressional approval of the Executive retention of submerged lands, the Tribe's beneficial ownership of those lands could not defeat the future State of Idaho's equal footing title. *Alaska,* 117 S.Ct. at 1910–11, 1915–17. Because the Plaintiffs do not contend that prior to 1873 Congress had authorized the Executive reservation of submerged lands, it is necessary to review events subsequent to the Executive Order of 1873 to determine whether Congress ratified the inclusion of the submerged lands within the reservation and demonstrated a clear intent to defeat the State's title to those lands. *See id.*

**1. Prior to Idaho's statehood; Congress was on notice that the Executive had reserved submerged lands for the benefit of the Tribe and Congress ratified the Executive retention of those lands, demonstrating a clear intent to defeat the future State of Idaho's equal footing title.**

In an effort to secure permanent status for the 1873 reservation and obtain compensation for the loss of tribal lands to miners, settlers and other emigrants, the Tribe on March 23, 1885, submitted a petition to the Federal Government requesting that a Commission visit the Coeur d'Alenes to "make with us a proper treaty of peace and friendship ... by which your Petitioners may be properly and fully compensat-

ed for such portion of their lands not now reserved to them; [and] that their present reserve may be confirmed to them." Ex. 206 at 42. In response, Congress authorized the Secretary of the Interior to negotiate with the Tribe "for the cession of their lands outside the limits of the present Coeur d'Alene reservation." Ex. 649. On March 26, 1887, the Tribe and representatives of the United States reached an agreement in which the Tribe ceded

> all right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation.

Ex. 215 at 68. In exchange, the Federal Government promised "that the Coeur d'Alene Reservation shall be held forever as Indian land and as homes of the Coeur d'Alene Indians." *Id.* The 1887 agreement provided that it "shall not be binding on either party until ratified by Congress." *Id.* at 69.

During this same time period, non-Indians continued to encroach on tribal lands and increasingly make use of the Lake and rivers. Beginning in 1880, steamboats operated on the Lake, delivering miners and supplies to a landing near the Old Coeur d'Alene Mission. Because government officials considered the Lake and rivers lying within the outer boundaries of the 1873 reservation to be "Indian country," the transportation or distribution of liquor on board the steamboats constituted a violation of the Intercourse laws.[17] Ex. 362; Ex. 364; Ex. 366; Ex. 370; Ex. 411; Ex. 2256; Ex. 3148; Ex. 3152. In one instance, the Acting Inspector General noted that "with the exceptions of a few indentations on its northern coast, the entire lake of Coeur d'Alene ... lay wholly within the Coeur d'Alene Indian Reservation," and then went on to recommend that a steam-

---

**17.** The Trade and Intercourse Act of 1834 "specifically penalized both the introduction of liquor into Indian country and the opera-

tion of a distillery therein." *Rice v. Rehner,* 463 U.S. 713, 722 n. 8, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983).

boat be seized when he observed "an open bar was kept on the boat, at which drinks or various sorts of liquor, were very freely and frequently sold." [18] Ex. 426.

In a similar manner, government officials treated non-Indians engaged in recreational use of the Lake and rivers as trespassers. Those trespassers found fishing within the boundaries of the reservation were ejected. In one report, a government official noted he had "removed from the Coeur d'Alene Lake & its tributary waters one hundred and fourteen (114) persons [who] were engaged in Camping & Fishing." Ex. 429; see also Ex. 2261.

Trespass on both the uplands and waterways of the reservation became so serious it was brought to the attention of Colonel Carlin, the commanding officer of Fort Sherman. Ex. 463; Ex. 465; Ex. 467; Ex. 468. Colonel Carlin, however, resisted employing his troops to remove the trespassers. He first suggested that the northern boundary of the reservation had not been properly surveyed, Ex. 470; Ex. 474; Ex. 2261, and argued for an adjustment in the reservation boundaries because "it must be apparent to the government that some provision must be made by which the white people can enjoy at least a portion of the lake there and its waters for pleasure as well as business," Ex. 2261. Finally, in a letter addressed to the Commissioner of Indian Affairs, dated December 19, 1887, Colonel Carlin recommended "that by executive and congressional action combined the lines [of the reservation] be changed" to locate the northern boundary line in the center of the Coeur d'Alene River, from the Mission to the river's mouth, and in the middle of the Lake, from the mouth of the Coeur d'Alene River to the head of the Spokane River. Ex. 480; Ex. 2333(map). Colonel Carlin explained that the new boundaries he proposed "would throw open to the public a part of the Lake for purposes of navigation and pleasure [and] would also throw open to the public the tract of land lying between Coeur d'Alene River and the Lake which is known to be valuable for its minerals but nearly worthless for agriculture." Ex. 480.

In an apparent effort to clarify the status of the Lake and rivers, the Senate, on January 25, 1888, passed a resolution which repeated the allegations made by Colonel Carlin and others,[19] and requested a response from the Secretary of Interior:

Whereas it is alleged that the present area of the Coeur d'Alene Indian reservation, in the Territory of Idaho, embraces 480,000 acres of land ... [and] that Lake Coeur d'Alene, all the navigable waters of Coeur d'Alene River, and about 20 miles of the navigable part of St. Joseph River, and part of St. Mary's, a navigable tributary of the Saint Joseph, are embraced within this reservation, except a shore-line of about 3½ miles at the north end of the lake ... that all boats now entering such waters are subject to the laws governing Indian country and all persons going on such lake or waters within the reservation lines are trespassers; and

Whereas it is further alleged that the Indians now on such reservation are located in the extreme southwest corner of the same ... and it being further alleged that all part of such reservation

---

18. The Secretary of War informed the Secretary of the Interior of the Acting Inspector General's recommendation and apparently the matter was discussed at a Cabinet meeting held on August 10, 1886. Ex. 418; Ex. 427. The day after the Cabinet meeting the Secretary of the Interior referred to the Commissioner of Indian Affairs, for immediate report and recommendation, this "violation of law relating to the sale of liquor on Indian reservations." Ex. 428.

19. In a petition to Congress, dated February 1, 1887, the Idaho Territorial Legislature asked that the northeast portion of the 1873 reservation be restored to the public domain and noted that "a navigable river [the Coeur d'Alene River] traverses said portion of the reservation from east to west." Ex. 3154 at 53.

lying between Lake Coeur d'Alene and Coeur d'Alene River and that part between the Coeur d'Alene River and St. Joseph River is a territory rich in the precious metals and at the same time being of no real use or benefit to the Indians: Therefore,

*Resolved,* That the Secretary of the Interior be, and he is hereby directed to inform the Senate as to the extent of the present area and boundaries of the Coeur d'Alene Indian Reservation ... whether such area includes any portion, and if so, about how much of the navigable waters of Lake Coeur d'Alene and of Coeur d'Alene and St. Joseph Rivers ... also whether, in the opinion of the Secretary, it is advisable to throw any portion of such reservation open to occupation and settlement under mineral laws of the United States, and if so, precisely what portion; and also whether it is advisable to release any of the navigable waters aforesaid from the limit of such reservation.

Ex. 187 at 693.

Responding on behalf of the Secretary of the Interior, the Commissioner of Indian Affairs, on February 7, 1888, reported to the Senate that "the reservation appears to embrace all the navigable waters of Lake Coeur d'Alene, except a very small fragment cut off by the north boundary of the reservation which runs 'in a direct line' from the Coeur d'Alene Mission to the head of Spokane River." *Ex.* 213 at 3. After describing the "proportion of the reservation" suitable for agriculture, grazing and mining, the Commissioner reiterated the question posed by the Senate resolution: whether it would be "advisable to throw any portion of the said reservation open to the occupation and settlement ... and, if so, precisely what portion, and whether it is desirable to release any of the navigable waters." *Id.* at 3–4. Based on his opinion "that the reservation might be materially diminished without detriment to the Indians," the Commissioner recommended "that changes could be made in the boundaries for the release of some or all of the navigable waters therefrom, which would be of great benefit to the public." *Id.* at 6. Although the Commissioner was "unable to say ... [j]ust what portion of the reservation and navigable waters should be segregated from the reservation," he thought it could "be determined by negotiations with the Indians." *Id.* The Commissioner concluded his report by opining that after ratification of the 1887 agreement "it will be an easy matter to negotiate with [the Tribe] for the cession of such portions of their reservation as they do not need, including all or a portion of the navigable waters, upon fair and very reasonable terms." *Id.* The Commissioner attached to his report a map of the 1873 reservation which depicted the Lake and rivers in relation to the reservation's boundaries and which displayed the total area of the reservation at 598,499.85 acres.

It was against this backdrop that Congress in 1888 debated the merits of the 1887 agreement. A 1890 House Report explained that the Fiftieth Congress (1888 session) decided against ratifying the 1887 agreement

for sundry reasons, among which was a desire on the part of the United States to acquire an additional area, to wit, a certain valuable portion of the reservation specially dedicated to the exclusive use of said Indians under an Executive order of 1873, and which portions of said lands, situate on the northern end of said reservation, is valuable and necessary to the citizens of the United States for sundry reasons. It contains numerous, extensive, and valuable mineral ledges. It contains large bodies of valuable timber .... It contains a magnificent sheet of water, the Coeur d'Alene Lake, and its chief tributary, to wit, the Coeur d'Alene River ....

Ex. 206 at 4.

While withholding its approval of the 1887 agreement, Congress took steps "to acquire ... the northern end of [the 1873]

reservation." *Id.* On March 2, 1989, Congress passed the annual Indian Appropriations Act, which included a provision that authorized the Secretary of the Interior "to negotiate with the Coeur d'Alene tribe of Indians for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell." Ex. 2288 at 1002.

In August and September of 1889, a three member Commission met with tribal leaders and negotiated for the release of the reservation's northern end. The minutes of the negotiations reveal that the location of the new boundaries in relation to the Lake and rivers was a matter of concern to both the Tribe and United States. Known for their sagacity, and aware of the Federal Government's tendency to disregard its commitments to the Indian tribes, the Coeur d'Alenes insisted on defining the terms of any new agreement with precision.[20] At one point during the negotiations, General Simpson, the government's chief spokesman, told tribal leader Chief Seltice that "the Lake belongs to you as well as to the whites—to all, every one who wants to travel on it." Ex. 215 at 9. Seltice replied: "That is your idea about the boundary. You know we do not understand papers; in taking it that way we will not know the boundaries." *Id.* General Simpson then offered the United States' proposal for a diminished reservation and prefaced his description of its boundaries by stating: "You all know where the St. Joseph River is. We do not want any of that." *Id.* The government's proposal called for a new northern boundary that ran east from the Idaho/Washing-

ton territorial line to the west shore of the Lake, meandered the lake shore south to a point directly opposite the mouth of the Coeur d'Alene River, and "thence due east across said lake." *Id.* Thus, the boundary line was drawn so as to bisect the Lake, with the northern two-thirds of Lake excluded from the reservation and the southern one-third of the Lake included within the new reservation boundaries. *See id.* at 14, attach.(map). General Simpson explained to the Tribe that under the government's proposal "if we buy this land [the northern end of the 1873 reservation] you still have the St. Joseph River and the lower part of the lake and all the meadow and agricultural land along the St. Joseph River." *Id.* at 9. With some modification, this proposal became the basis of an agreement signed on September 9, 1889.[21] The agreement provided that it was "not binding on either party until ratified by Congress." *Id.* at 14.

In a 1889/90 Report of the Secretary of the Interior to the House of Representatives, the 1889 agreement is described as an agreement "whereby the Indians agreed to sell a considerable portion of their reservation (in the northern part), valuable chiefly for minerals and timber, and embracing by far the greater portion of the navigable waters of the reservation." Ex. 250 at 22; *see also* Ex. 206 at 4.

Prior to congressional approval of the 1887 and 1889 agreements, Idaho became a state. As part of that process, Congress passed the Idaho Statehood Act, which admitted Idaho "into the Union on an equal footing with the original States in all respects whatever; and ... accepted, rati-

---

**20.** The Tribe's hard bargaining practices inspired French trappers to call tribal members "Coeur d'Alenes," which translates directly to "Heart of an Awl," but was commonly interpreted as meaning "Pointed Hearts." The name symbolized the trappers' perception that tribal members negotiated with a "hard heart." Hart Report (Ex. 1437) at 48–49.

**21.** Under the government's original proposal, the new boundary line, after crossing the Lake, was to meander "southerly along the

east shore of said lake to a point 1 mile north of the St. Joseph River," and then head east to the eastern boundary. Ex. 215 at 9. Under the final agreement, the new boundary line ran "to a point due west of the mouth of the Coeur d'Alene River, where it empties into the said lake; thence in a due east line until it intersects with the eastern boundary of the said reservation." *Id.* at 3, 13, 14, attach.(map).

fied, and confirmed" the Idaho State Constitution. Ex. 221 at 215. The state constitution contains a section disclaiming

all right and title to the unappropriated public lands lying within the boundaries [of Idaho], and to all lands lying within [Idaho] owned or held by any Indians or Indian tribes; and until the title thereto shall have been extinguished by the United States, the same shall be subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States.

Ex. 2294. Shortly after Idaho secured statehood, Congress, on March 3, 1891, ratified the 1887 and 1889 agreements. Ex. 3255.

Taken together, these events establish that Congress ratified the Executive reservation of the submerged lands and demonstrated the clear intent to defeat the future State of Idaho's title to those lands. The evidence shows that prior to Idaho's statehood, Congress was on notice that the Executive Order of 1873 reserved for the benefit of the Tribe the submerged lands within the boundaries of the Coeur d'Alene Reservation. The Senate pointedly asked the Secretary of Interior to confirm whether the Tribe retained control over the "navigable waters of Lake Coeur d'Alene and of Coeur d'Alene and St. Joseph Rivers." Ex. 187 at 693. The Commissioner of Indian Affairs, responding in detail, answered in the affirmative.[22] It is difficult to imagine a set of circumstances that could with any greater certainty place be-

fore Congress the fact that the 1873 reservation included the land beneath the Lake and rivers.[23] *Cf. Alaska*, 117 S.Ct. at 1916–17 (finding Congress was on notice that an application reflected the Secretary of Interior's intent to reserve submerged lands where the action of making the application had been publicly announced, formal notice of the application had been published in the Federal Register and the Secretary had submitted a map to Congress showing the application area embraced submerged lands).

With this knowledge, Congress validated the Executive reservation of the submerged lands by enacting appropriation statutes that authorized government representatives to negotiate with the Coeur d'Alenes for a cession of tribal property. Ex. 99 at 272–73; Ex. 649; Ex. 2288. Most important, after the Commissioner of Indian Affairs had in no uncertain terms informed Congress that the Executive reservation included the submerged lands, Congress enacted a provision which authorized the Secretary of the Interior "to acquire ... the northern end of said reservation." Ex. 206 at 4. By authorizing the Federal Government to negotiate with the Tribe for a release of the submerged lands, Congress acknowledged that the Executive Order of 1873 had effectively conveyed beneficial ownership of those lands to the Coeur d'Alenes. Accordingly, the Court concludes that Congress recognized and then ratified the Executive reservation of the submerged lands for the benefit of the Tribe.[24] *See, e.g., Alaska,*

---

**22.** The House of Representatives also was on notice that the Executive reservation included the submerged lands. Ex. 206 at 4; Ex. 250 at 21–22.

**23.** The actions by the Federal Government during the years following the 1873 agreement and Executive Order, which in all respects treat the submerged lands within the reservation as belonging to the Coeur d'Alenes, confirm the Executive intent in 1873 to retain those lands for the benefit of the Tribe. *Alaska Pacific Fisheries,* 248 U.S. at 89–90, 39 S.Ct. 40 (finding support for conclusion that the Federal Government intended to reserve

submerged lands for benefit of Indians in subsequent conduct that treated the reservation as including submerged lands).

**24.** The United State contends that despite the explicit language contained in both the 1887 and 1889 agreements, stating that they shall not be "binding on either party until ratified by Congress," each agreement became effective on the date signed. The Court need not decide this issue. The date that either agreement became effective is relevant to determining when, if ever, the Tribe ceded its title to certain lands. But because this case is limited to resolving ownership claims of sub-

117 S.Ct. at 1911, 1915–17 (holding that once Congress is on notice that the Executive intended to reserve submerged lands, subsequent action by Congress that recognizes federal retention of those lands constitutes a ratification of the Executive action, and citing *Holden v. Joy,* 17 Wall. 211, 247, 21 L.Ed. 523 (1872) ("rejecting Property Clause challenge to President's treaty with Cherokee Nation; although terms of treaty exceeded express delegation of authority by Congress to the President, Congress had 'repeatedly recognized' the validity of the treaty by enacting appropriation statutes")); *see also Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 494–96, 57 S.Ct. 244, 81 L.Ed. 360 (1937).

By explicitly recognizing, prior to Idaho's statehood, an Executive reservation that included submerged lands, Congress demonstrated the clear intent to defeat the State's equal footing title. *See Alaska,* 117 S.Ct. at 1910–11 (explaining that Congress has demonstrated the clear intent to defeat a state's equal footing title if prior to statehood Congress recognizes an executive reservation of submerged lands for a pur-

pose that requires federal ownership). Retention of the submerged lands was necessary to achieve the United States' objective, *id* at 1910, and Congress clearly contemplated continued federal ownership of those lands, *id.* at 1917. The 1889 agreement by its terms anticipates that the Tribe will remain the beneficial owner of the southern third of the Lake. The northern boundary line of the diminished reservation was drawn so as to bisect the Lake, and the minutes of the 1889 negotiations confirm that the placement of the boundary line was for the purpose of establishing the Tribe's rights to the Lake and rivers. This is "compelling evidence" that the United States intended for the Tribe to hold a beneficial interest in the submerged lands under the southern third of the Lake. *See, e.g., Namen,* 665 F.2d at 962 & n. 28. Congress could not have carried into effect the terms of the 1889 agreement without retaining title to the submerged lands. Congress clearly demonstrated its intent to reserve the submerged lands under federal control by ratifying the Executive inclusion of the submerged land within the 1873 reservation.[25] *See Alaska,* 117 S.Ct. at 1910–11, 1915–17.

---

merged lands that never were ceded, the Court must only decide whether Congress ratified the Executive reservation of those lands prior to Idaho's statehood. As discussed above, the Court concludes that Congress ratified the inclusion of the submerged lands before Idaho became a state.

In the alternative, the United States asserts that the General Allotment Act of 1887 (the "Dawes Act") constituted congressional recognition of all Executive order reservations. Unfortunately for the government, the United States Supreme Court already has rejected this argument. *Sioux Tribe of Indians,* 316 U.S. at 330, 62 S.Ct. 1095 (holding that the Dawes Act "did not amount to a recognition of tribal ownership"). It is noteworthy, however, that in 1890 the Commissioner of Indian Affairs also believed that the Dawes Act constituted a blanket recognition of all Executive reservations. He specifically related the purported effect of the Dawes Act to the status of the Coeur d'Alene Reservation: "The permanency of this tenure is further shown by the act of Congress authorizing and directing the Secretary of the Interior to negotiate with the Coeur d'Alene tribe of Indians in Idaho for

the purchase and release of a portion of their reservation which was established by executive order ...." Ex. 1313. This is one more indication that Congress could have authorized the Secretary to negotiate with the Tribe for the release of the Lake and rivers only if at the same time Congress recognized the Tribe's beneficial ownership of the submerged lands.

**25.** The issue at this point of the analysis is not, as the State seems to imply, whether the Federal Government intended to include submerged lands within the 1873 reservation or whether a "public exigency" supported such an inclusion; those questions were asked and answered in relation to the point in time that the Executive acted to create the reservation. *See, e.g., Alaska,* 117 S.Ct. at 1908–09, 1914–15. Instead the inquiry must now focus on whether Congress realized that in 1873 the President "construed his reservation authority to extend to submerged lands and had exercised that authority to set aside uplands and submerged lands" for the benefit of the Tribe and, if so, whether Congress ratified the Executive action and demonstrated the clear intent

In the Idaho Statehood Act, Congress made explicit the intent to defeat Idaho's title to the submerged lands. In that statute, Congress admitted Idaho into the Union "on an equal footing with the original states," subject to the disclaimer clause of the Idaho State Constitution, which renounced the State's "right and title to the unappropriated public lands" and lands "owned or held by any Indians or Indian tribes." Ex. 2294. In this respect, the Idaho Statehood Act "operated to confirm [Idaho's] title to equal footing lands ... unless the United States clearly withheld submerged lands ... prior to statehood." *Alaska,* 117 S.Ct. at 1917; *see also United States v. Gardner,* 107 F.3d 1314, 1319–20 (9th Cir.1997) (explaining that disclaimer clause is a recognition of preexisting United States title), *cert. denied,* 522 U.S. 907, 118 S.Ct. 264, 139 L.Ed.2d 191 (1997); *cf. Aam,* 887 F.2d at 198 (concluding that submerged lands were not "held" by tribe within meaning of disclaimer clause because tribe had not shown Federal Government reserved submerged lands for benefit of tribe). As explained above, the Executive Order of 1873 reflected a clear intent to reserve the submerged lands for the benefit of the Tribe and prior to Idaho's statehood Congress ratified the reservation of those lands. Thus, at the time Idaho secured statehood, the United States had clearly retained title to the submerged lands and conveyed a beneficial interest to the Tribe, thereby withholding, pursuant to the Idaho Statehood Act, the transfer of those lands to the State. *See Alaska,* 117 S.Ct. at 1916–17; *cf. Utah*

*Div. of State Lands,* 482 U.S. at 202, 208, 107 S.Ct. 2318.

**2. The Plaintiffs have overcome the strong presumption of State ownership by demonstrating that the Federal Government intended to include the submerged lands within the Coeur d'Alene Reservation and that Congress intended to defeat the State's title to those lands.**

In sum, the Court concludes that the United States retained, for the benefit of the Tribe, the submerged lands within the exterior boundaries of the present-day Coeur d'Alene Reservation.[26] Application of the three-part *Puyallup* test to the trial evidence demonstrates that the Federal Government clearly intended to include the submerged lands within the 1873 reservation. The evidence also shows a "public exigency" supported the Executive reservation of the submerged lands for the benefit of the Tribe. In addition, the terms and purpose of the 1873 agreement and Executive Order provide "compelling evidence" of a federal intent to reserve the submerged lands. The response of the Commissioner of Indian Affairs to the Senate resolution put Congress on notice that submerged lands had been included in the 1873 reservation. The fact that Congress directed the Secretary of the Interior to negotiate with the Tribe for a release of the submerged lands reflected Congress' intent to ratify the inclusion of submerged lands within the reservation and to defeat the State's title to those lands. In the Idaho Statehood Act, Congress confirmed that the Federal Government retained title

to defeat the State's title to those lands. *Id.* at 1911. As a practical matter, and as is true here, the congressional approval of an Executive reservation of submerged lands for a purpose that is inimical to State ownership often will also amount to a demonstration of Congress' intent to defeat the State's equal footing title. *See id.* at 1911–12, 1915–17; *cf. Utah Div. of State Lands,* 482 U.S. at 198–207, 107 S.Ct. 2318 (explaining that where Congress has delegated to the Executive the power to reserve lands and there is no unambiguous evidence that members of Congress under-

stood subsequent Executive reservations included submerged lands and purpose of reservation did not require federal ownership, plaintiff must show Congress "affirmatively intended to defeat the future State's title to such land").

**26.** The Court's decision is expressly limited to a determination of the ownership of the submerged lands lying within the present-day boundaries of the Coeur d'Alene Reservation.

to the submerged lands for the benefit of the Tribe.[27]

## C. Subsequent Events Substantiate That the Title to the Submerged Lands Did Not Pass to Idaho at Statehood.

Events subsequent to Idaho's admission into the Union support the conclusion that title to the submerged lands did not pass to Idaho at statehood. *See Alaska Pacific Fisheries,* 248 U.S. at 89–90, 39 S.Ct. 40 (finding support for conclusion that the Federal Government intended to reserve submerged lands for benefit of Indians in subsequent conduct that treated the reservation as including submerged lands). In 1893 and 1894, the Federal Government and the Tribe engaged in negotiations for the relinquishment of an area adjacent to the mouth of the Coeur d'Alene River. During the negotiations, the parties frequently referred to the fact that the 1889 agreement created a boundary line in relation to the Lake and mouth of the Coeur d'Alene River. *See* Hart Report (Ex. 1437) at 246–67; Ex. 207; Ex. 604. In a final agreement, the Tribe agreed to cede to the United States a one-mile strip of land, running from the mouth of the Coeur d'Alene River to the reservation's eastern boundary (the "Harrison cession"). Ex. 207.

The boundaries of the Harrison cession clearly reflect the Tribe's beneficial ownership of land underlying the Lake. The mile wide western boundary line is located in the Lake; the southern boundary begins at a right angle to the western boundary and runs east for more than a mile across the Lake. Ex. 140; Ex. 2334. A cession that included the lake bed would not have been necessary if title to the submerged lands had passed to Idaho at statehood.

## V. *ORDER*

Based on the foregoing, and the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED** that:

1. Title is quieted in favor of the United States, as trustee, and the Coeur d'Alene Tribe of Idaho, as the beneficially interested party of the trusteeship, to the bed and banks of the Coeur d'Alene Lake and the St. Joe River lying within the current boundaries of the Coeur d'Alene Indian Reservation;

2. The United States, as trustee, and the Coeur d'Alene Tribe of Idaho, as the beneficially interested party of the trusteeship, are entitled to the exclusive use, occupancy and right to the quiet enjoyment of the bed and banks of the Coeur d'Alene Lake and the St. Joe River lying within the current boundaries of the Coeur d'Alene Indian Reservation; and

3. The State of Idaho is permanently enjoined from asserting any right, title or otherwise interest in or to the bed and banks of the Coeur d'Alene Lake and the St. Joe River lying within the current boundaries of the Coeur d'Alene Indian Reservation.

**IT IS FURTHER ORDERED** that the State of Idaho's counterclaim is **DENIED.**

**IT IS FURTHER ORDERED** that within fourteen (14) days of the date of this Order, the Plaintiffs shall submit a proposed judgment and decree.

---

27. In light of the Court's conclusion, it need not decide whether the doctrine of aboriginal title applies to submerged lands and, if so, whether the Tribe's aboriginal title to the submerged lands remains unextinguished.