## UNITED STATES *v.* HOLT STATE BANK ET AL.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 47. Argued April 24, 27, 1925.—Decided February 1, 1926.

1. In general, lands underlying navigable waters within a State belong to the State in its sovereign capacity and may be used and disposed of as it may elect, subject to the paramount power of Congress to control such waters for the purposes of navigation in interstate and foreign commerce. P. 54.

2. Where the United States, after acquiring the territory and before the creation of the State, has granted rights in such lands, in carrying out public purposes appropriate to the objects for which the territory was held, such rights are not impaired by the subsequent creation of the State, and the rights which otherwise would then pass to the State in virtue of its admission into the Union are restricted and qualified accordingly. *Id.*

3. But disposals by the United States, during the territorial period, of lands under navigable water should not be regarded as intended unless the intention was made very plain by definite declaration or otherwise. P. 55.

4. Navigability, when asserted as the basis of a right arising under the Constitution, is a question of federal law, to be determined by the rule applied in the federal courts, and not by a local standard. *Id.*

5. By the federal rule, streams or lakes which are navigable in fact are navigable in law; they are navigable in fact when used, or susceptible of use, in their natural and ordinary condition, as highways of commerce over which trade and travel are or may be conducted in the customary modes on water; and navigability does not depend on the particular mode of such actual or possible use— whether by steamboats, sailing vessels or flatboats—nor on the absence of occasional difficulties in navigation, but upon whether the stream, in its natural and ordinary condition, affords a channel for useful commerce. P. 56.

6. The evidence requires a finding that Mud Lake, in Minnesota, now drained, was navigable when Minnesota was created a State in 1858. *Id.*

7. At the time of Minnesota's admission as a State, Mud Lake and other and much larger navigable waters within her limits were

100569°—26——4

included in the Red Lake Indian Reservation, which had resulted from a succession of treaties by which the Chippewas ceded to the United States their right of occupancy of the surrounding lands, leaving this remainder of the aboriginal territory, recognized as a reservation but never formally set apart as such. There had been no affirmative declaration of the Indians' rights in the reservation, nor any attempted exclusion of others from the use of the navigable waters therein. *Held* that the land under Mud Lake passed to the State, since there was nothing to evince a purpose of the General Government to depart from the established policy of holding such land for the benefit of the future State. P. 57.

294 Fed. 161, affirmed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a decree of the District Court dismissing on the merits, after final hearing, a bill brought by the United States to quiet title to the bed of a drained lake and to enjoin the defendants from asserting any claim to the land.

*Mr. W. W. Dyar,* Special Assistant to the Attorney General, with whom *Solicitor General Beck, Assistant Attorney General Wells* and *Mr. S. W. Williams,* Special Assistant to the Attorney General, were on the brief, for the United States.

Mud Lake was never a navigable body of water in fact, therefore the title to its bed did not vest in the State. *The Daniel Ball,* 10 Wall. 557; *The Montello,* 20 Wall. 430; *Leovy* v. *United States,* 177 U. S. 621; *Harrison* v. *Fite,* 148 Fed. 781; *Oklahoma* v. *Texas,* 258 U. S. 574; *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77.

Tested by the rules laid down in the cases cited, it will be readily seen that Mud Lake falls far short of being a navigable body of water. It may have had sufficient depth at times of floods for the use of boats of light draft, but there were seasons when the lake was practically dry land, and often in times of water the boats that were used upon the lake had to be poled or pulled across the shallow

places.  Moreover, there was no commerce to be conducted
on the lake, as the country was sparsely settled and there
was little or no occasion for it.

To admit a multiplicity of rules defining navigability
would be to violate the principle of equality among the
States under pretense of observing it; and to permit the
various States to define the rule for themselves would be
in effect to make them the arbiters of their respective pre-
rogatives under the Constitution and submit the property
rights of the United States to State determination.  29 Op.
A. G. 455.

The Government clearly had the right to limit its pat-
ents to lands above the meander line.  *Oklahoma* v. *Texas,*
258 U. S. 574; 29 Op. A. G. 455; *Mitchell* v. *Smale,* 140
U. S. 406; *Chapman & Dewey Lumber Co.* v. *St. Francis
Levee District,* 232 U. S. 186.  The United States owned
the lake bed in trust for the Indians and was under obliga-
tions to them to dispose of it for their benefit.  *Minnesota*
v. *Hitchcock,* 185 U. S. 373; *Shively* v. *Bowlby,* 152 U. S.
1; *United States* v. *Winans,* 198 U. S. 371.  The United
States was not bound by the proceedings had in the state
court.  *Stanley* v. *Schwalby,* 162 U. S. 255.

*Mr. A. N. Eckstrom,* with whom *Messrs. W. E. Rowe*
and *Ole J. Vaule* were on the brief, for appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of
the Court.

This is a bill in equity by the United States to quiet in
it the title to the bed of Mud Lake—now drained and un-
covered—in Marshall County, Minnesota, and to enjoin
the defendants from asserting any claim thereto.  After
answer and a hearing the District Court entered a decree
dismissing the bill on the merits.  The United States
appealed to the Circuit Court of Appeals, where the de-
cree was affirmed, 294 Fed. 161, and then by a further
appeal brought the case here.

Mud Lake is within what formerly was known as the Red Lake Indian Reservation, which had an area exceeding 3,000,000 acres and was occupied by certain bands of the Chippewas of Minnesota. Most of the reservation, including the part in the vicinity of Mud Lake, was relinquished and ceded by the Chippewas conformably to the Act of January 14, 1889, c. 24, 25 Stat. 642, for the purposes and on the terms stated in that Act. It provided that the lands when ceded should be surveyed, classified as "pine lands" and "agricultural lands," and disposed of in designated modes; that such as were classified as agricultural should be disposed of under the homestead law at a price of $1.25 an acre; and that the net proceeds of all, whether classified as pine or agricultural, should be put into an interest-bearing trust fund for the Chippewas and ultimately disbursed for their benefit or distributed among them.

The cession became effective through the President's approval March 4, 1890. Thereafter the lands in the vicinity of Mud Lake were surveyed and platted in the usual way, the lake being meandered and represented on the plat as a lake. The tracts bordering on the lake were classified as agricultural, opened to homestead entry and disposed of to homestead settlers, patents being issued in due course. The defendants now own and hold these tracts under the patents. After the homestead entries were allowed, and after most of them were carried to patent, the lake was drained and its bed made bare by a public ditch constructed under the drainage laws of the State. The United States then surveyed the bed with the purpose of disposing of it for the benefit of the Indians under the Act of 1889, and later brought this suit to clear the way for such a disposal.

The lake in its natural condition covered an area of almost 5,000 acres and was traversed by Mud River, a tributary of Thief River, which was both navigable in

itself and directly connected with other navigable streams leading to the western boundary of the State and thence along that boundary to the British possessions on the north.

The ditch which drained the lake was established as a means of fitting for cultivation a large body of swamp lands in that general vicinity. It is as much as 30 miles long, and, like Mud River, passes through the lake and discharges into Thief River. Its depth exceeds that of the lake and its width and fall are such that it has drawn the water out of the lake. Its construction was begun in 1910 and was so far completed in 1912 that the lake was then effectively drained.

The swamp lands which the ditch was intended to re-claim were within the ceded portion of the Red Lake Reservation. Some had been disposed of under the Act of 1889 and thus had passed into private ownership; but the absence of necessary drainage was preventing or re-tarding the disposal of the others. Congress caused an examination to be made to determine whether drainage was physically and economically feasible, Acts of June 21, 1906, c. 3504, 34 Stat. 352, and March 1, 1907, c. 2285, 34 Stat. 1033; and a report of the examination was made, H. R. Doc. No. 607, 59th Cong. 2d Sess. Shortly there-after Congress gave its assent to the drainage of the lands under the laws of the State by declaring that all lands not entered and all entered lands for which a final certificate had not issued should "be subject to all the provisions of the laws of said State relating to the drainage of swamp or overflowed lands for agricultural purposes to the same extent and in the same manner in which lands of a like character held in private ownership are or may be sub-ject to said laws." Act May 20, 1908, c. 181, 35 Stat. 169.

The laws of the State, to the application of which assent was thus given, authorized the establishment of public drainage ditches by judicial proceedings and provided that

such ditches might be so established as to widen, deepen, change or drain any river or lake, even if navigable and whether meandered or not. Laws 1905, c. 230; Gen. Stat. 1913, §§ 5523, 5525, 5531, 5553, *et seq.* The ditch which drained Mud Lake was established by judicial proceedings begun under these laws after the congressional consent was given; and it is not questioned that those proceedings made it entirely lawful to construct the ditch through the lake and to drain it as an incident of the reclamation project in hand.

The defendants insist that the lake in its natural condition was navigable, that the State on being admitted into the Union became the owner of its bed, and that under the laws of the State the defendants as owners of the surrounding tracts have succeeded to the right of the State. On the other hand, the United States insists that the lake never was more than a mere marsh, that the State never acquired any right to it, that the surveyor should have extended the survey over it when he surveyed the adjacent lands, and that the United States is entitled and in duty bound to dispose of it under the Act of 1889 for the benefit of the Chippewas.

Both courts below resolved these contentions in favor of the defendants; and whether they erred in this is the matter for decision here.

It is settled law in this country that lands underlying navigable waters within a State belong to the State in its sovereign capacity and may be used and disposed of as it may elect, subject to the paramount power of Congress to control such waters for the purposes of navigation in commerce among the States and with foreign nations, and subject to the qualification that where the United States, after acquiring the territory and before the creation of the State, has granted rights in such lands by way of performing international obligations, or effecting the use or improvement of the lands for the purposes of commerce

among the States and with foreign nations, or carrying out other public purposes appropriate to the objects 'for which the territory was held, such rights are not cut off by the subsequent creation of the State, but remain unimpaired, and the rights which otherwise would pass to the State in virtue of its admission into the Union are restricted or qualified accordingly. *Barney* v. *Keokuk,* 94 U. S. 324, 338; *Shively* v. *Bowlby,* 152 U. S. 1, 47–48, 57–58; *Scott* v. *Lattig,* 227 U. S. 229, 242; *Port of Seattle* v. *Oregon & Washington R. R. Co.,* 255 U. S. 56, 63; *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77, 83–85. But, as was pointed out in *Shively* v. *Bowlby,* pp. 49, 57–58, the United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future States, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency. It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain.

The State of Minnesota was admitted into the Union in 1858, c. 31, 11 Stat. 285, and under the constitutional principle of equality among the several States the title to the bed of Mud Lake then passed to the State, if the lake was navigable, and if the bed had not already been disposed of by the United States.

Both courts below found that the lake was navigable. But they treated the question of navigability as one of local law to be determined by applying the rule adopted in Minnesota. We think they applied a wrong standard. Navigability, when asserted as the basis of a right arising under the Constitution of the United States, is necessarily a question of federal law to be determined according to

the general rule recognized and applied in the federal courts. *Brewer-Elliott Oil & Gas Co.* v. *United States, supra,* p. 87. To treat the question as turning on the varying local rules would give the Constitution a diversified operation where uniformity was intended. But notwithstanding the error below in accepting a wrong standard of navigability, the findings must stand if the record shows that according to the right standard the lake was navigable.

The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce. *The Montello,* 20 Wall. 430, 439; *United States* v. *Cress,* 243 U. S. 316, 323; *Economy Light & Power Co.* v. *United States,* 256 U. S. 113, 121; *Oklahoma* v. *Texas,* 258 U. S. 574, 586; *Brewer-Elliott Oil & Gas Co.* v. *United States, supra,* p. 86.

The evidence set forth in the record is voluminous and in some respects conflicting. When the conflicts are resolved according to familiar rules we think the facts shown are as follows: In its natural and ordinary condition the lake was from three to six feet deep. When meandered in 1892 and when first known by some of the witnesses it was an open body of clear water. Mud River traversed it in such way that it might well be characterized as an

enlarged section of that stream. Early visitors and settlers in that vicinity used the river and lake as a route of travel, employing the small boats of the period for the purpose. The country about had been part of the bed of the glacial Lake Agassiz and was still swampy, so that waterways were the only dependable routes for trade and travel. Mud River after passing through the lake connected at Thief River with a navigable route extending westward to the Red River of the North and thence northward into the British possessions. Merchants in the settlements at Liner and Grygla, which were several miles up Mud River from the lake, used the river and lake in sending for and bringing in their supplies. True, the navigation was limited, but this was because trade and travel in that vicinity were limited. In seasons of great drought there was difficulty in getting boats up the river and through the lake, but this was exceptional, the usual conditions being as just stated. Sand bars in some parts of the lake prevented boats from moving readily all over it, but the bars could be avoided by keeping the boats in the deeper parts or channels. Some years after the lake was meandered, vegetation such as grows in water got a footing in the lake and gradually came to impede the movement of boats at the end of each growing season, but offered little interference at other times. Gasoline motor boats were used in surveying and marking the line of the intended ditch through the lake and the ditch was excavated with floating dredges.

Our conclusion is that the evidence requires a finding that the lake was navigable within the approved rule before stated. From this it follows that no prejudice resulted from the recognition below of the local rule respecting navigability.

We come then to the question whether the lands under the lake were disposed of by the United States before Minnesota became a State. An affirmative disposal is

not asserted, but only that the lake, and therefore the lands under it, was within the limits of the Red Lake Reservation when the State was admitted. The existence of the reservation is conceded, but that it operated as a disposal of lands underlying navigable waters within its limits is disputed. We are of opinion that the reservation was not intended to effect such a disposal and that there was none. If the reservation operated as a disposal of the lands under a part of the navigable waters within its limits it equally worked a disposal of the lands under all. Besides Mud Lake, the reservation limits included Red Lake, having an area of 400 square miles, the greater part of the Lake of the Woods, having approximately the same area, and several navigable streams. The reservation came into being through a succession of treaties with the Chippewas whereby they ceded to the United States their aboriginal right of occupancy to the surrounding lands. The last treaties preceding the admission of the State were concluded September 30, 1854, 10 Stat. 1109, and February 22, 1855, 10 Stat. 1165. There was no formal setting apart of what was not ceded,* nor any affirmative declaration of the rights of the Indians therein, nor any attempted exclusion of others from the use of navigable waters. The effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory; and thus it came to be known and recognized as a reservation. *Minnesota* v. *Hitchcock,* 185 U. S. 373, 389. There was nothing in this which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a purpose to depart from the established policy, before stated, of treating such lands as held for the

---

* Other reservations for particular bands were specially set apart, but those reservations and bands are not to be confused with the Red Lake Reservation and the bands occupying it. See Treaty concluded October 2, 1863, 13 Stat. 667,

benefit of the future State. Without doubt the Indians were to have access to the navigable waters and to be entitled to use them in accustomed ways; but these were common rights vouchsafed to all, whether white or Indian, by the early legislation reviewed in *Railroad Company* v. *Schurmeir,* 7 Wall. 272, 287–289, and *Economy Light & Power Co.* v. *United States, supra,* pp. 118–120, and emphasized in the Enabling Act under which Minnesota was admitted as a State, c. 60, 11 Stat. 166, which declared that the rivers and waters bounding the State "and the navigable waters leading into the same shall be common highways, and forever free, as well to the inhabitants of said State as to all other citizens of the United States."

We conclude that the State on its admission into the Union became the owner of the bed of the lake. It is conceded that, if the bed thus passed to the State, the defendants have succeeded to the State's right therein; and the decisions and statutes of the State brought to our attention show that the concession is rightly made.

*Decree affirmed.*