# IDAHO *v.* UNITED STATES ET AL.

No. 00–189.   Argued April 23, 2001—Decided June 18, 2001

SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which SCALIA, KENNEDY, and THOMAS, JJ., joined, *post*, p. 281.

*Steven W. Strack*, Deputy Attorney General of Idaho, argued the cause for petitioner. With him on the briefs were *Alan G. Lance*, Attorney General, and *Clive J. Strong*, Deputy Attorney General.

*Raymond C. Givens* argued the cause for respondent Coeur d'Alene Tribe. With him on the brief were *Brian J. Cleary* and *Joseph D. Kearney*. *David C. Frederick* argued the cause for the United States. With him on the brief were *Acting Solicitor General Underwood, Acting Assistant Attorney General Cruden, Deputy Solicitor General Kneedler, James C. Kilbourne*, and *Hank Meshorer*.*

---

*\*Dennis Molenaar, Jerry K. Boyd, Douglas P. Payne*, and *Nancy A. Wolff* filed a brief of *amici curiae* urging reversal for Benewah County et al.

A brief of *amici curiae* was filed for the State of California et al. by *Bill Lockyer*, Attorney General of California, *Richard M. Frank*, Chief Assistant Attorney General, and *J. Matthew Rodriquez* and *Jan S. Stevens*, Assistant Attorneys General, and by the Attorneys General for their

JUSTICE SOUTER delivered the opinion of the Court.

The United States brought this quiet title action against the State of Idaho. The question is whether the National Government holds title, in trust for the Coeur d'Alene Tribe, to lands underlying portions of Lake Coeur d'Alene and the St. Joe River. We hold that it does.

I

The Coeur d'Alene Tribe once inhabited more than 3.5 million acres in what is now northern Idaho and northeastern Washington, including the area of Lake Coeur d'Alene and the St. Joe River. 95 F. Supp. 2d 1094, 1095–1096, 1099–1100 (Idaho 1998).[1] Tribal members traditionally used the lake and its related waterways for food, fiber, transportation, recreation, and cultural activities. *Id.*, at 1099–1102. The Tribe depended on submerged lands for everything from water potatoes harvested from the lake to fish weirs and traps anchored in riverbeds and banks. *Id.*, at 1100.

Under an 1846 treaty with Great Britain, the United States acquired title to the region of Lake Coeur d'Alene, see Treaty in Regard to Limits Westward of the Rocky Mountains, 9 Stat. 869, subject to the aboriginal right of possession held by resident tribes, see generally *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 414 U. S. 661, 667 (1974); F. Cohen, Handbook of Federal Indian Law 486–493 (1982 ed.). In 1867, in the face of immigration into the Tribe's aboriginal territory, 95 F. Supp. 2d, at 1102, President Johnson issued an Executive Order setting aside a reservation of comparatively modest size, although the Tribe was

---

respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Mark Pryor* of Arkansas, *Wayne Stenehjem* of North Dakota, *Hardy Myers* of Oregon, *Mark W. Barnett* of South Dakota, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, and *Gay Woodhouse* of Wyoming.

[1] Petitioner, the State of Idaho, did not challenge the District Court's factual findings on appeal. See 210 F. 3d 1067, 1070 (CA9 2000).

apparently unaware of this action until at least 1871, when it petitioned the Government to set aside a reservation, *id.*, at 1102–1103. The Tribe found the 1867 boundaries unsatisfactory, due in part to their failure to make adequate provision for fishing and other uses of important waterways. When the Tribe petitioned the Commissioner of Indian Affairs a second time, it insisted on a reservation that included key river valleys because "we are not as yet quite up to living on farming" and "for a while yet we need have some hunting and fishing." App. 27.

Following further negotiations, the Tribe in 1873 agreed to relinquish (for compensation) all claims to its aboriginal lands outside the bounds of a more substantial reservation that negotiators for the United States agreed to "set apart and secure" "for the exclusive use of the Coeur d'Alene Indians, and to protect . . . from settlement or occupancy by other persons." *Id.*, at 33. The reservation boundaries described in the agreement covered part of the St. Joe River (then called the St. Joseph), and all of Lake Coeur d'Alene except a sliver cut off by the northern boundary. *Id.*, at 33–34; 95 F. Supp. 2d, at 1095–1096.

Although by its own terms the agreement was not binding without congressional approval, App. 36–37, later in 1873 President Grant issued an Executive Order directing that the reservation specified in the agreement be "withdrawn from sale and set apart as a reservation for the Cur d'Alène Indians." Exec. Order of Nov. 8, 1873, reprinted in 1 C. Kapler, Indian Affairs: Laws and Treaties 837 (1904). The 1873 Executive Order set the northern boundary of the reservation directly across Lake Coeur d'Alene, which, the District Court found, was contrary "to the usual practice of meandering a survey line along the mean high water mark." 95 F. Supp. 2d, at 1108; App. 14, 20 (expert trial testimony).[2]

---

[2] Although the State did not challenge the District Court's factual findings below, it claims in its reply brief to us that it was "commonplace" for reservation boundaries to cross navigable waters. Reply Brief for

An 1883 Government survey fixed the reservation's total area at 598,499.85 acres, which the District Court found necessarily "included submerged lands within the reservation boundaries." 95 F. Supp. 2d, at 1108.

As of 1885, Congress had neither ratified the 1873 agreement nor compensated the Tribe. This inaction prompted the Tribe to petition the Government again, to "make with us a proper treaty of peace and friendship . . . by which your petitioners may be properly and fully compensated for such portion of their lands not now reserved to them; [and] that their present reserve may be confirmed to them." App. 350–351. In response, Congress authorized new negotiations to obtain the Tribe's agreement to cede land outside the borders of the 1873 reservation. Act of May 15, 1886, ch. 333, 24 Stat. 44. In 1887, the Tribe agreed to cede

> "all right, title, and claim which they now have, or ever had, to all lands in said Territories [Washington, Idaho, and Montana] and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation." App. 378.

The Government, in return, promised to compensate the Tribe, and agreed that

> "[i]n consideration of the foregoing cession and agreements . . . the Coeur d'Alene Reservation shall be held forever as Indian land and as homes for the Coeur d'Alene Indians . . . and no part of said reservation shall ever be sold, occupied, open to white settlement,

---

Petitioner 9. Ultimately, this factual dispute is of little consequence; the District Court found that the boundary and acreage calculations showed the understanding of the Government and the Tribe that submerged lands were included, 95 F. Supp. 2d, at 1108, and the State conceded on appeal that "[c]ertainly, . . . by 1888, the executive branch had construed the 1873 Coeur d'Alene Reservation as including submerged lands." Opening Brief for Appellant in No. 98–35831 (CA9), p. 17.

or otherwise disposed of without the consent of the Indians residing on said reservation." *Id.*, at 379.

As before, the agreement was not binding on either party until ratified by Congress. *Id.*, at 382.

In January 1888, not having as yet ratified any agreement with the Tribe, the Senate expressed uncertainty about the extent of the Tribe's reservation and adopted a resolution directing the Secretary of the Interior to "inform the Senate as to the extent of the present area and boundaries of the Coeur d'Alene Indian Reservation in the Territory of Idaho," and specifically, "whether such area includes any portion, and if so, about how much of the navigable waters of Lake Coeur d'Alene, and of Coeur d'Alene and St. Joseph Rivers." S. Misc. Doc. No. 36, 50th Cong., 1st Sess., 1 (1888). The Secretary responded in February 1888 with a report of the Commissioner of Indian Affairs, stating that "the reservation appears to embrace all the navigable waters of Lake Coeur d'Alene, except a very small fragment cut off by the north boundary of the reservation," and that "[t]he St. Joseph River also flows through the reservation." S. Exec. Doc. No. 76, 50th Cong., 1st Sess., 3 (1888). Based largely, it appears, on this report, Idaho conceded in the Court of Appeals (as it does here) that the 1873 Executive Order reservation included submerged lands. See Opening Brief for Appellant in No. 98–35831 (CA9), p. 17 ("Certainly, the State concedes that by 1888, the executive branch had construed the 1873 Coeur d'Alene Reservation as including submerged lands"); Brief for Petitioner 17.

In May 1888, shortly after receiving the Secretary's report, Congress passed an Act granting a right-of-way to the Washington and Idaho Railroad Company "for the extension of its railroad through the lands in Idaho Territory set apart for the use of the Coeur d'Alene Indians by executive order, commonly known as the Coeur d'Alene Indian Reservation." Act of May 30, 1888, ch. 336, § 1, 25 Stat. 160. Notably, the Act directed that the Tribe's consent be obtained and that

the Tribe alone (no one else being mentioned) be compensated for the right-of-way, a part of which crossed over navigable waters within the reservation. *Id.,* § 3, 25 Stat. 161; see also Reply Brief for Petitioner 16.

Congress was not prepared to ratify the 1887 agreement, however, owing to a growing desire to obtain for the public not only any interest of the Tribe in land outside the 1873 reservation, but certain portions of the reservation itself. The House Committee on Indian Affairs later recalled that the 1887 agreement was not promptly ratified for

> "sundry reasons, among which was a desire on the part of the United States to acquire an additional area, to wit, a certain valuable portion of the reservation specially dedicated to the exclusive use of said Indians under an Executive order of 1873, and which portions of said lands, situate[d] on the northern end of said reservation, is valuable and necessary to the citizens of the United States for sundry reasons. It contains numerous, extensive, and valuable mineral ledges. It contains large bodies of valuable timber. . . . It contains a magnificent sheet of water, the Coeur d'Alene Lake . . . ." H. R. Rep. No. 1109, 51st Cong., 1st Sess., 4.(1890).

But Congress did not simply alter the 1873 boundaries unilaterally. Instead, the Tribe was understood to be entitled beneficially to the reservation as then defined, and the 1889 Indian Appropriations Act included a provision directing the Secretary of the Interior "to negotiate with the Coeur d'Alene tribe of Indians," and, specifically, to negotiate "for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell." Act of Mar. 2, 1889, ch. 412, § 4, 25 Stat. 1002. Later that year, the Tribe and Government negotiators reached a new agreement under which the Tribe would cede

the northern portion of the reservation, including approximately two-thirds of Lake Coeur d'Alene, in exchange for $500,000. App. 198; see also 95 F. Supp. 2d, at 1113. The new boundary line, like the old one, ran across the lake, and General Simpson, a negotiator for the United States, reassured the Tribe that "you still have the St. Joseph River and the lower part of the lake." App. 183. And, again, the agreement was not to be binding on either party until both it and the 1887 agreement were ratified by Congress. *Id.*, at 199.

On June 7, 1890, the Senate passed a bill ratifying both the 1887 and 1889 agreements. S. 2828, 51st Cong., 1st Sess. (1890); 21 Cong. Rec. 5769–5770 (1890). On June 10, the Senate bill was referred to the House, where a parallel bill had already been reported by the House Committee on Indian Affairs. H. R. Rep. No. 1109, 51st Cong., 1st Sess. (1890); see 21 Cong. Rec. 2775 (1890).

On July 3, 1890, while the Senate bill was under consideration by the House Committee on Indian Affairs, Congress passed the Idaho Statehood Act, admitting Idaho into the Union "on an equal footing with the original States," Act of July 3, 1890, ch. 656, 26 Stat. 215. The Statehood Act "accepted, ratified, and confirmed" the Idaho Constitution, *ibid.*, which "forever disclaim[ed] all right and title to . . . all lands lying within [Idaho] owned or held by any Indians or Indian tribes" and provided that "until the title thereto shall have been extinguished by the United States, the same shall be subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States," Idaho Const., Art. XXI, § 19 (1890).

A little over a month later, on August 19, 1890, the House Committee on Indian Affairs reported that the Senate bill ratifying the 1887 and 1889 agreements was identical to the House bill that it had already recommended. H. R. Rep. No. 2988, 51st Cong., 1st Sess. (1890). On March 3, 1891, Congress "accepted, ratified, and confirmed" both the 1887

and 1889 agreements with the Tribe. Act of Mar. 3, 1891, ch. 543, §§ 19, 20, 26 Stat. 1027, 1029. The Act also directed the Secretary of the Interior to convey to one Frederick Post a "portion of [the] reservation," *id.*, at 1031, that the Tribe had purported to sell to Post in 1871.[3] The property, located on the Spokane River and known as Post Falls, was described as "all three of the river channels and islands, with enough land on the north and south shores for water-power and improvements." *Ibid.*

In 1894, Congress approved yet another agreement with the Tribe, this time for the cession of a lakeside townsite called Harrison, within the boundary of the ratified reservation. Act of Aug. 15, 1894, ch. 290, 28 Stat. 322, agreement reprinted in App. 389; see also 95 F. Supp. 2d, at 1117. The agreement with the Tribe described the cession as covering "all the land" embraced within a tract that included a portion of the lake. App. 392. Like the earlier railroad cession, this one was subject to compensation to the Tribe and no one else.

The United States, acting in its own capacity and as trustee for the Tribe, initiated this action against the State of Idaho to quiet title (in the United States, to be held for the use and benefit of the Tribe) to the submerged lands within the exterior boundaries of the Tribe's current reservation, which encompass the lower third of Lake Coeur d'Alene and part of the St. Joe River.[4] The Tribe inter-

---

[3] See generally, *e. g.*, *Oneida Indian Nation of N. Y.* v. *County of Oneida*, 414 U. S. 661, 667–668 (1974) (under common law and various Nonintercourse Acts, Indian title can only be extinguished with federal consent).

[4] Because this action was brought by the United States, it does not implicate the Eleventh Amendment bar raised when the Tribe pressed its own claim to the submerged lands in *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261 (1997). See *Arizona* v. *California*, 460 U. S. 605, 614 (1983).

The United States's complaint was apparently motivated by Idaho's issuance of permits for the construction of "docks, piers, floats, pilings, breakwaters, boat ramps and other such aids to navigation within the

vened to assert its interest in the submerged lands, and Idaho counterclaimed, seeking to quiet title in its own favor. *Ibid.* Following a 9-day trial, the District Court quieted title "in favor of the United States, as trustee, and the Coeur d'Alene Tribe of Idaho, as the beneficially interested party of the trusteeship, to the bed and banks of the Coeur d'Alene Lake and the St. Joe River lying within the current boundaries of the Coeur d'Alene Indian Reservation." 95 F. Supp. 2d, at 1117. The Court of Appeals for the Ninth Circuit affirmed. 210 F. 3d 1067 (2000). We granted certiorari, 531 U. S. 1050 (2000), and we now affirm.

## II

Due to the public importance of navigable waterways, ownership of the land underlying such waters is "strongly identified with the sovereign power of government." *Montana* v. *United States,* 450 U. S. 544, 552 (1981). See generally *Idaho* v. *Coeur d'Alene Tribe of Idaho,* 521 U. S. 261, 284 (1997); *United States* v. *Alaska,* 521 U. S. 1, 5 (1997). In order to allow new States to enter the Union on an "equal footing" with the original States with regard to this important interest, "the United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory . . . as held for the ultimate benefit of future States." *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926); see also *Shively* v. *Bowlby,* 152 U. S. 1, 48–50 (1894). Therefore, in contrast to the law governing surface land held by the United States, see *Scott* v. *Lattig,* 227 U. S. 229, 244 (1913), the default rule is that title to land under navigable waters passes from the United States to a newly admitted State. *Shively, supra,* at 26–50. Specifically, although Congress has the power before statehood to convey land beneath navigable waters, and to reserve such land for the United States, "'[a] court

southern one-third of Coeur d'Alene Lake." Complaint in CIV94–0328–N–EJL (D. Idaho), pp. 6–7.

deciding a question of title to the bed of navigable water must . . . begin with a strong presumption' against defeat of a State's title." *Alaska, supra,* at 34 (quoting *Montana, supra,* at 552).

Armed with that presumption, we have looked to Congress's declarations and intent when we have had to resolve conflicts over submerged lands claimed to have been reserved or conveyed by the United States before statehood. *Alaska, supra,* at 36 ("Whether title to submerged lands rests with a State, of course, is ultimately a matter of federal intent"); *Utah Div. of State Lands v. United States,* 482 U. S. 193, 201–202 (1987); *Montana, supra,* at 550–557; *Holt State Bank, supra,* at 57–59; *Alaska Pacific Fisheries v. United States,* 248 U. S. 78, 87–90 (1918); *Shively, supra,* at 48–51.

The issue of congressional intent is refined somewhat when submerged lands are located within a tract that the National Government has dealt with in some special way before statehood, as by reserving lands for a particular national purpose such as a wildlife refuge or, as here, an Indian reservation. Because reserving submerged lands does not necessarily imply the intent "to defeat a future State's title to the land," *Utah Div. of State Lands, supra,* at 202, we undertake a two-step enquiry in reservation cases. We ask whether Congress intended to include land under navigable waters within the federal reservation and, if so, whether Congress intended to defeat the future State's title to the submerged lands. *Alaska, supra,* at 36; *Utah, supra,* at 202.

Our most recent case of this sort, *United States v. Alaska, supra,* addressed two parcels of land initially reserved not by Congress but, as here, by the Executive Branch. We explained that the two-step test of congressional intent is satisfied when an Executive reservation clearly includes submerged lands, and Congress recognizes the reservation in a way that demonstrates an intent to defeat state title. *Id.,* at 41–46, 55–61. We considered whether Congress was

on notice that the Executive reservation included submerged lands, see *id.*, at 42, 45, 56, and whether the purpose of the reservation would have been compromised if the submerged lands had passed to the State, *id.*, at 42–43, 45–46, 58. Where the purpose would have been undermined, we explained, "[i]t is simply not plausible that the United States sought to reserve only the upland portions of the area," *id.*, at 39–40.

Here, Idaho has conceded that· "the executive branch had intended, or by 1888 had interpreted, the 1873 Executive Order Reservation to include submerged lands." Brief for Petitioner 17. The concession is a sound one. A right to control the lakebed and adjacent waters was traditionally important to the Tribe, which emphasized in its petition to the Government that it continued to depend on fishing. Cf. *Montana, supra,* at 556 (finding no intent to include submerged lands within a reservation where the tribe did not depend on fishing or use of navigable water). The District Court found that the acreage determination of the reserved area in 1883 necessarily included the area of the lakebed within the unusual boundary line crossing the lake from east to west. Cf. *Alaska, supra,* at 39 (concluding that a boundary following the ocean side of offshore islands necessarily embraced submerged lands shoreward of the islands). In light of those findings and Idaho's concession, the parties here concentrate on the second question, of Congress's intent to defeat Idaho's title to the submerged lands.[5]

---

[5] The District Court and Court of Appeals accepted the United States's position that it had reserved the submerged lands, and that Congress intended that reservation to defeat Idaho's title. They did not reach the Tribe's alternative theory that, notwithstanding the scope of any reservation, the Tribe retained aboriginal title to the submerged lands, which cannot be extinguished without explicit action by Congress, see *Oneida Indian Nation,* 414 U. S., at 667–668; cf. *United States* v. *Winans,* 198 U. S. 371, 381 (1905) (explaining that a treaty ceding some aboriginal lands to the United States and setting apart other lands as a reservation "was not a grant of rights to the Indians, but a grant of rights from

In the Court of Appeals, Idaho also conceded one point covered in this second part of the enquiry. It agreed that after the Secretary of the Interior's 1888 report that the reservation embraced nearly "all the navigable water of Lake Coeur d'Alene," S. Exec. Doc. No. 76, 50th Cong., 1st Sess., at 3, Congress was on notice that the Executive Order reservation included submerged lands. Opening Brief for Appellant in No. 98–35831 (CA9), at 11 ("[Congress was] informed that the Coeur d'Alene Reservation embraced submerged lands"). Again, Idaho's concession was prudent in light of the District Court's findings of facts. 95 F. Supp. 2d, at 1114 ("The evidence shows that prior to Idaho's statehood, Congress was on notice that the Executive Order of 1873 reserved for the benefit of the Tribe the submerged lands within the boundaries of the Coeur d'Alene Reservation").

The District Court did not merely impute to Congress knowledge of the land survey, but also explained how the submerged lands and related water rights had been continuously important to the Tribe throughout the period prior to congressional action confirming the reservation and granting Idaho statehood. And the District Court made the following findings about the period preceding negotiations authorized by Congress:

> "The facts demonstrate that an influx of non-Indians into the Tribe's aboriginal territory prompted the Federal Government to negotiate with the Coeur d'Alenes in an attempt to confine the Tribe to a reservation and to obtain the Tribe's release of its aboriginal lands for settlement. Before it would agree to these conditions, however, the Tribe demanded an enlarged reservation that included the Lake and rivers. Thus, the Federal Government could only achieve its goals of promoting

them—a reservation of those not granted"). The Tribe does not press its unextinguished-aboriginal-title argument here. See Brief for Respondent Coeur d'Alene Tribe 25, n. 12.

settlement, avoiding hostilities and extinguishing aboriginal title by agreeing to a reservation that included the submerged lands." *Id.*, at 1107.[6]

This, in summary, was the background for the 1873 Executive Order's inclusion of submerged lands, which in turn were the subject of the 1888 request by the Senate to the Secretary of the Interior for advice about the Tribe's rights over the "navigable waters of Lake Coeur d'Alene and the Coeur d'Alene and St. Joseph Rivers," S. Misc. Doc. No. 36, 50th Cong., 1st Sess., at 1. As noted, the Secretary answered in the affirmative, S. Exec. Doc. No. 76, 50th Cong., 1st Sess., at 3, consistently with the survey indicating that the submerged lands were within the reservation. Thus, the District Court remarked that it would be difficult to imagine circumstances that could have made it more plain to Congress that submerged lands were within the reservation. 95 F. Supp. 2d, at 1114.

The manner in which Congress then proceeded to deal with the Tribe shows clearly that preservation of the land within the reservation, absent contrary agreement with the Tribe, was central to Congress's complementary objectives of dealing with pressures of white settlement and establishing the reservation by permanent legislation. The Tribe had shown its readiness to fight to preserve its land rights when in 1858 it defeated a force of the United States military, which it misunderstood as intending to take aboriginal lands. See H. R. Rep. No. 1109, 51st Cong., 1st Sess., at 2–3. The concern with hostility arose again in 1873 before the reservation boundaries were established, when a surveyor on the

---

[6] See also Commissioner of Indian Affairs, Annual Report (1873), reprinted in App. 45 (explaining that Tribe was dissatisfied with a previous reservation and that the 1873 agreement was required "[f]or the purpose of extinguishing [the Tribe's] claim to all the tract of country claimed by them"). See generally *Montana* v. *United States*, 450 U. S. 544, 556 (1981) (creation of Indian reservation is appropriate public purpose justifying defeat of state title to submerged lands).

scene had warned the Surveyor General that "[s]hould the fisheries be excluded there will in my opinion be trouble with these Indians." App. 30.

Hence, although the goal of extinguishing aboriginal title could have been achieved by congressional fiat, see *Tee-Hit-Ton Indians* v. *United States,* 348 U. S. 272, 279–282 (1955), and Congress was free to define the reservation boundaries however it saw fit, the goal of avoiding hostility seemingly could not have been attained without the agreement of the Tribe. Congress in any event made it expressly plain that its object was to obtain tribal interests only by tribal consent. When in 1886 Congress took steps toward extinguishing aboriginal title to all lands outside the 1873 boundaries, it did so by authorizing negotiation of agreements ceding title for compensation. Soon after that, when Congress decided to seek a reduction in the size of the 1873 reservation itself, the Secretary of the Interior advised the Senate against fiddling with the scope of the reservation without the Tribe's agreement. The report of February 1888 likewise urged that any move to diminish the reservation "should be done, if done at all, with the full and free consent of the Indians, and they should, of course, receive proper compensation for any land so taken." App. 129. Accordingly, after receiving the Secretary's report, Congress undertook in the 1889 Act to authorize negotiation with the Tribe for the consensual, compensated cession of such portions of the Tribe's reservation "as such tribe shall consent to sell," Act of Mar. 2, 1889, ch. 412, § 4, 25 Stat. 1002. In the meantime it honored the reservation's recently clarified boundaries by requiring that the Tribe be compensated for the Washington and Idaho Railroad Company right-of-way, Act of May 30, 1888, ch. 336, § 1, 25 Stat. 160.

The facts, including the provisions of Acts of Congress in 1886, 1888, and 1889, thus demonstrate that Congress understood its objective as turning on the Tribe's agreement to the abrogation of any land claim it might have and to any

reduction of the 1873 reservation's boundaries. The explicit statutory provisions requiring agreement of the Tribe were unchanged right through to the point of Congress's final 1891 ratification of the reservation, in an Act that of course contained no cession by the Tribe of submerged lands within the reservation's outer boundaries. Nor, it should be added, is there any hint in the evidence that delay in final passage of the ratifying Act was meant to pull a fast one by allowing the reservation's submerged lands to pass to Idaho under a legal presumption, by virtue of the Statehood Act approved eight months before Congress took final action on the reservation. There is no evidence that the Act confirming the reservation was delayed for any reason but comparison of the respective House and Senate bills, to assure that they were identical prior to the House's passage of the Senate version.[7]

The record thus answers the State's argument that, because the 1889 Act indicates that Congress sought to obtain portions of the reservation "valuable chiefly for minerals and timber," Congress was not necessarily thinking one thing or another about the balance of the reservation land. Reply Brief for Petitioner 6–7; see also Tr. of Oral Arg. 12–13. The argument simply ignores the evidence that Congress did know that the reservation included submerged lands, and that it authorized the reservation's modification solely by agreement. The intent, in other words, was that anything not consensually ceded by the Tribe would remain for the Tribe's benefit, an objective flatly at odds with Idaho's view that Congress meant to transfer the balance

---

[7] Given the preceding discussion of, among other things, the earlier congressional Acts, it should go without saying that this reference to the fact that the Senate passed the ratification Act before statehood is not intended to suggest that the Senate action constituted the enactment of an expression of intent on behalf of the whole Congress, let alone that it was sufficient of itself to defeat Idaho's title to the submerged lands. But cf. *post*, at 285 (REHNQUIST, C. J., dissenting).

of submerged lands to the State in what would have amounted to an act of bad faith accomplished by unspoken operation of law. Indeed, the implausibility of the State's current position is underscored by the fact that it made a contrary argument in the Court of Appeals, where it emphasized the District Court's finding that the 1889 Act was an authorization "to negotiate with the Tribe for a release of the submerged lands," and recognized that "[Congress was] informed that the Coeur d'Alene Reservation embraced submerged lands." Opening Brief for Appellant in No. 98–35831 (CA9), at 11, 31.

Idaho's position is at odds not only with evidence of congressional intent before statehood, but also with later congressional understanding that statehood had not affected the submerged lands in question. Eight months after passing the Statehood Act, Congress ratified the 1887 and 1889 agreements in their entireties (including language in the 1887 agreement that "the Coeur d'Alene Reservation shall be held forever as Indian land"), with no signal that some of the land over which the parties to those agreements had negotiated had passed in the interim to Idaho. The ratification Act suggested in a further way Congress's understanding that the 1873 reservation's submerged lands had not passed to the State, by including a provision confirming the Tribe's sale of river channels to Frederick Post. Confirmation would have been beyond Congress's power if title to the submerged riverbed had already passed to the State.[8] Finally, the Act of Congress ceding the portion of

---

[8] The State says that the conveyance to Post included land that was outside the boundary of the 1873 reservation. Reply Brief for Petitioner 18. That merely suggests the possibility that Congress intended to defeat the State's title to even more territory than the United States is claiming here.

The State also hypothesizes that the relevant portions of the Spokane River may not have been considered navigable at the time of the conveyance, ibid., in which case the equal footing doctrine would not apply and the conveyance would say nothing about Congress's intent with regard to

reservation land for the townsite of Harrison confirms Congress's understanding that the lakebed within the reservation's boundaries was part of the reservation. Only three years after the Act confirming the reservation, the townsite cession was treated just as the right-of-way for the railroad had been treated before statehood. The Tribe (and no one else) was compensated for a cession whose bounds suggested inclusion of submerged lands; the boundary lines did not stop at the water's edge and meander the entire shore, but continued into the area of the lake to encompass submerged territory that the National Government simply could not have conveyed if it had passed to Idaho at the time of statehood.[9]

In sum, Congress undertook to negotiate with the Coeur d'Alene Tribe for reduction in the territory of an Executive Order reservation that Idaho concedes included the submerged lands at issue here. Congress was aware that the submerged lands were included and clearly intended to redefine the area of the reservation that covered them only by consensual transfer, in exchange for the guarantee that the Tribe would retain the remainder. There is no indica-

submerged lands underlying navigable waters. We need not resolve this factual question, which was not addressed below. Suffice it to say that Congress's actions in 1891 were consistent with an understanding that the State did not have title to the riverbeds conveyed to Post, which, along with the later Harrison cession of part of the concededly navigable lake, is consistent with an understanding that no submerged lands within the reservation's stated boundaries had passed to Idaho.

[9] Here, we agree with the dissent, *post,* at 284, that Congress cannot, after statehood, reserve or convey submerged lands that "ha[ve] already been bestowed" upon a State. See *Shively* v. *Bowlby,* 152 U. S. 1, 26–28 (1894) (citing *Lessee of Pollard* v. *Hagan,* 3 How. 212 (1845)). Our point in mentioning Congress's actions after statehood is merely to confirm what Congress's prestatehood actions already make clear: that the lands at issue here were not bestowed upon Idaho at statehood, because Congress intended that they remain tribal reservation lands barring agreement to the contrary.

tion that Congress ever modified its objective of negotiated consensual transfer, which would have been defeated if Congress had let parts of the reservation pass to the State before the agreements with the Tribe were final. Any imputation to Congress either of bad faith or of secrecy in dropping its express objective of consensual dealing with the Tribe is at odds with the evidence. We therefore think the negotiating history, not to mention subsequent events, "ma[k]e [it] very plain," *Holt State Bank*, 270 U. S., at 55, that Congress recognized the full extent of the Executive Order reservation lying within the stated boundaries it ultimately confirmed, and intended to bar passage to Idaho of title to the submerged lands at issue here.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, dissenting.

The Court makes out a plausible case for the proposition that, on the day Idaho was admitted to the Union, the Executive Branch of the Federal Government had intended to retain in trust for the Coeur d'Alene Indian Tribe the submerged lands under a portion of Lake Coeur d'Alene. But the existence of such intent on the part of the Executive Branch is simply not enough to defeat an incoming State's title to submerged lands within its borders. Decisions of this Court going back more than 150 years establish this proposition beyond a shadow of a doubt.

"[T]he ownership of land under navigable waters," it bears repeating, "is an incident of sovereignty." *Montana* v. *United States*, 450 U. S. 544, 551 (1981). Recognizing this important relationship, this Court "announced the principle that the United States held the lands under navigable waters in the Territories 'in trust' for the future States that would

be created." *Utah Div. of State Lands* v. *United States,* 482 U. S. 193, 196 (1987) (quoting *Lessee of Pollard* v. *Hagan,* 3 How. 212, 230 (1845)). That duty may not lightly be disregarded, and, as the Court rightly observes, our inquiry "begin[s] with a strong presumption against defeat of a State's title." *Ante,* at 273 (internal quotation marks and citations omitted). Accordingly, "disposals [of submerged lands] by the United States during the territorial period . . . should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926); see also *Montana, supra,* at 552 ("[The Court] must not infer such a conveyance unless the intention was definitely declared or otherwise made very plain, or was rendered in clear and especial words, or unless the claim confirmed in terms embraces the land under the waters of the stream" (internal quotation marks and citations omitted)).

The Court makes three critical mistakes in its application of the equal footing doctrine here—errors that significantly dilute the doctrine. First and foremost, the Court misconceives the scope of historical events directly relevant to the question whether Congress *had,* by July 3, 1890, acted to withhold title to submerged lands from the entering State of Idaho. At the very moment that Idaho entered the Union "on an equal footing with the original States," Act of July 3, 1890, ch. 656, 26 Stat. 215, Congress and the President vested in Idaho the accoutrements of sovereignty, including title to submerged lands. It is therefore improper for the Court to look to events after Idaho's admission in order to discern whether Congress had months or years previously intended to divest the entering State of its submerged lands. Indeed, I am aware of no case applying the equal footing doctrine to determine title to submerged lands in which this Court has looked beyond the moment of statehood for evidence of federal intent.

Our decision in *United States* v. *Alaska*, 521 U. S. 1 (1997), is particularly illustrative of the timeframe relevant to our inquiry. That case concerned in part Alaska's assumption of title to submerged lands within the National Petroleum Reserve-Alaska (Reserve) and the Arctic National Wildlife Refuge (Refuge). See *id.*, at 4. In stark contrast to today's decision, the Court in its lengthy discussion in *Alaska* resisted entirely the temptation to delve into the treatment of the lands in question in the months and years following Alaska's admission to the Union in 1959. And the invitation to do so hardly could have been more obvious with respect to the Refuge, which had been "set apart" as a wildlife reservation but had not yet been formally approved by the Secretary of the Interior. *Id.*, at 46–47. "This application," the Court observed, "was still pending in July 1958, when Congress passed the Alaska Statehood Act, and in January 1959, when Alaska was formally admitted to the Union." *Id.*, at 46. Although the Court noted that the application was approved several months after Alaska's admission, the Court considered the pending application as relevant only insofar as it put Congress on notice of the action. See *id.*, at 56. The *Alaska* Court did not give—contrary to the Court's reasoning in the present case—any import to the fact that the application ultimately was approved. Indeed, *Alaska*'s focus on the instant of statehood as the crucial moment of inquiry could hardly be more clear. See, *e. g., id.*, at 42 ("The conclusion that Congress was aware when it passed the Alaska Statehood Act that the Reserve encompassed submerged lands is reinforced by other legislation, *enacted just before Alaska's admission to the Union,* granting certain offshore lands to the Territory of Alaska"); *id.*, at 55 ("We now consider whether, *prior to Alaska's admission to the Union,* the United States defeated the future State's title to the submerged lands included within the proposed Range" (emphases added)). Other cases indicate

a similar emphasis. See, *e. g., Utah Div. of State Lands, supra,* at 195; *Montana,* 450 U. S., at 551.[1]

Accordingly, insofar as the submerged lands at issue here are concerned, it is of no moment that Congress ultimately ratified the 1887 and 1889 negotiations. See *ante,* at 279. Well before it took such action, Congress had given its assent to Idaho's entry into the Union as a sovereign State and thereby joined with the Executive to extinguish the Federal Government's right to withhold title to submerged lands. It follows that Congress' acceptance of the fact that "the Coeur d'Alene Reservation shall be held forever as Indian land," *ibid.,* does nothing to explain whether submerged lands were within that reservation at the time of—much less eight months after—Idaho's admission. By the same token, our inquiry is not illuminated by Congress' attempt in 1891 to affirm Chief Seltice's purported conveyance of certain lands to Frederick Post, see *ante,* at 271, 279, or by Congress' approval in 1894 of the so-called "Harrison cession," see *ante,* at 279–280. Simply put, the consequences of admission are instantaneous, and it ignores the uniquely sovereign character of that event for the Court to suggest that subsequent events somehow can diminish what has already been bestowed.

Second, all agree (at least in theory) that the question before us is "whether *Congress* intended to include land under navigable waters within the federal reservation and, if so, whether *Congress* intended to defeat the future State's title to the submerged lands," *ante,* at 273 (emphasis added). But the Court proceeds to determine this "intent" by considering what obviously are *not* Acts of Congress. Congress

---

[1] The Court of Appeals stated that "we are aware of no rule forbidding consideration of such [post-statehood] events. Indeed, the case law may suggest the contrary. See *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89–90 (1918)." 210 F. 3d 1067, 1079, n. 17 (CA9 2000). This citation is puzzling indeed, for Alaska was not admitted to the Union until some 40 years after the Court's decision in *Alaska Pacific Fisheries.*

itself did authorize negotiations with the Tribe in 1886 and 1889, but those Acts expressly provided that any resulting agreements were not binding "until ratified by Congress." Act of May 15, 1886, 24 Stat. 44, App. 51; Act of Mar. 2, 1889, 25 Stat. 1002, App. 144. And it is undisputed that ratification did not occur before Idaho gained admission. The Court, however, is willing to divine congressional intent to withhold submerged lands from the State from what are best described as inchoate prestatehood proceedings. In the Court's view it is sufficient that one House of Congress had acted to approve the agreements and that the other was in the process of considering similar legislation. See *ante*, at 278. The Court thus speaks of the "final" ratification of the 1887 and 1889 negotiations as if the official approval of both Houses of Congress was but a mere formality. *Ibid.* But see U. S. Const., Art. I, § 7, cl. 2. But the indisputable fact remains that, as of July 3, 1890, "Congress" had passed the Idaho Statehood Act but had not ratified the 1887 and 1889 agreements.

Nor do our prior decisions in this area support the Court's decision to wander so far afield. In *Alaska,* we evaluated the impact of an express provision in the Alaska Statehood Act, Pub. L. 85–508, 72 Stat. 347, reserving certain lands for the United States. 521 U. S., at 41–42. There the evidence that "Congress expressed a clear intent to defeat state title" to submerged lands came in the form of a duly passed federal statute rather than as inferences drawn from preludes to future congressional Acts. *Id.,* at 41. Indeed, that Statehood Act abounds in specificity, in § 11(b) directly identifying the Reserve, and in § 6(e) defining other reserved lands in some detail.[2] So, too, in *Utah Division of State*

---

[2] Again, the Court's reliance on language contained in the Idaho Statehood Act affirming the Idaho Constitution is unavailing. See *ante*, at 270. Clauses indicating that the entering State "forever disclaims all right and title to . . . all lands . . . owned or held by any Indians or Indian tribes" were boilerplate formulations at the time, and the inclusion of

*Lands* we evaluated prestatehood federal statutes without reference to inchoate proceedings lacking the force of law. 482 U. S., at 198–200 (discussing the impact on Utah's claim to certain submerged lands of the Sundry Appropriations Act of 1888, 25 Stat. 505, and the Sundry Appropriations Act of 1890, ch. 837, 26 Stat. 371). Cf. *Montana, supra,* at 550–555 (considering whether certain treaties vested property rights in the Crow Indians). We thus wisely have not relied on this sort of evidence in the past, and it is unfortunate that we embark upon that route today.

Third, despite the critical relationship between submerged lands and sovereignty, the Court makes the unwarranted assumption that any use granted with respect to navigable waters must necessarily include reserving title to the submerged lands below them. As the Court previously has explained, the purpose underlying a reservation of territorial lands is often probative of federal intent. See, *e. g., Alaska,* 521 U. S., at 39. Even accepting the District Court's conclusions regarding the Tribe's dietary habits, and further accepting this Court's inference that Congress was concerned with the Tribe's access to navigable waters,[3] it does

---

this language hardly compares to the precision employed in the Alaska Statehood Act. Indeed, every State admitted between the years 1889 and 1912 entered with such a disclaimer. See N. D. Const., Art. 16, § 2 (1889); S. D. Const., Art. XXII, § 18 (1889); Mont. Const., Ordinance I (1889); Wash. Const., Art. XXVI, § 2 (1889); Wyo. Const., Ordinance § 3 (1889); Utah Const., Art. III (1894); Okla. Const., Art. I, § 3 (1906); N. M. Const., Art. XXI, § 2 (1910); Ariz. Const., Art. XX, par. 4 (1910). Tellingly, in each of these Constitutions save Oklahoma's, the relevant language is identical to that in the Idaho Constitution. This disclaimer, in any event, simply begs the question whether submerged lands were in fact "owned or held" by the Coeur d'Alene Tribe upon Idaho's admission.

[3] This inference may not be justified. Although Idaho apparently has conceded that the 1873 Executive Order included submerged lands within the reservation, that fact hardly confirms that Congress made a similar statement in simply authorizing negotiations with the Tribe. *United States* v. *Alaska,* 521 U. S. 1 (1997), moreover, indicates that it is at best

not necessarily follow that Congress intended to reserve title in submerged lands by authorizing negotiations leading to the cession of portions of the reservation established by the 1873 Executive Order.

It is perfectly consistent with the assumption that Congress wanted to preserve the Coeur d'Alene Indians' way of life to conclude that, if Congress meant to grant the Tribe any interest in Lake Coeur d'Alene, it was more likely a right to fish and travel the waters rather than withholding for the Tribe's benefit perpetual title in the underlying lands. See *Montana*, 450 U. S., at 554 ([Although the treaty] gave the Crow Indians the sole right to use and occupy the reserved land, and, implicitly, the power to exclude others from it, the respondents' reliance on that provision simply begs the question of the precise extent of the conveyed lands to which this exclusivity attaches"); see also *ibid.* ("The mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed that might overcome the presumption against its conveyance").

For this reason, Congress' decision in 1888 to grant a right-of-way to the Washington and Idaho Railroad Company across a part of the Coeur d'Alene Reservation is not clear evidence of Congress' intent with respect to submerged lands. All but a miniscule portion of the right-of-way passes along surface lands, and it crosses the lake only at one of its narrowest points. There is no mention of submerged lands in the authorizing resolution, and it seems obvious that Congress required the company to pay

an open question whether Executive action alone is sufficient to withhold title to submerged lands. *Id.*, at 43–45; cf. U. S. Const., Art. IV, § 3, cl. 2 ("The *Congress* shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" (emphasis added)). Thus, the majority rests far too much weight on Idaho's concession regarding the 1873 reservation.

compensation to the Tribe because of the significant impact the railroad would have upon surface lands:

> "[T]he right of way hereby granted to said company shall be seventy-five feet in width on each side of the central line of said railroad as aforesaid[;] and said company shall also have the right to take from said lands adjacent to the line of said road material, stone, earth, and timber necessary for the construction of said railroad; also, ground adjacent to such right of way for station-buildings, depots, machine-shops, side-tracks, turnouts, and water-stations, not to exceed in amount three hundred feet in width and three thousand feet in length for each station, to the extent one station for each ten miles of road." App. 138.

Thus, I do not think it just to infer any intent regarding submerged lands from Congress' requirement of compensation for what was to be primarily an intrusion—and a significant one at that—upon surface lands.

In sum, the evidence of congressional intent properly before the Court today fails to rise to anywhere near the level of certainty our cases require. Congress' desire to divest an entering State of its sovereign interest in submerged lands must be "definitely declared or otherwise made very plain," *Montana, supra,* at 552. That standard has not been met here.